STATE of Tennessee, Appellee,

v.

Roosevelt BIGBEE, Appellant.

Supreme Court of Tennessee,
at Nashville.

Oct. 3, 1994.

Broch Mehler, Capitol Case Resource Center, Nashville, William B. Vest (deceased), Niceville, FL, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Rebecca L. Gundt, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

ANDERSON, Justice.

In this capital case, the defendant, Roosevelt Bigbee, was convicted of first-degree felony murder in an attempt to perpetrate a robbery. In the sentencing hearing, the jury found two aggravating circumstances: (1) that the defendant was previously convicted of one or more violent felonies; and (2) that the murder was committed while the defendant was attempting to commit a robbery. Tenn.Code Ann. § 39–2–203(i)(2), and (7) (1982).[1] The jury found that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances and sentenced the defendant to death by electrocution.

On appeal, the defendant raises numerous issues for our review which involve alleged errors occurring during both the guilt and sentencing phases of trial. We have carefully considered the defendant's contentions as to errors occurring during the guilt phase and have decided that none require reversal. We therefore affirm the defendant's conviction.

However, we conclude that the sentence of death must be reversed and the case remanded for a new sentencing hearing. Irrelevant evidence was admitted regarding the defendant's previous conviction of first-degree felony murder, and that error, combined with improper prosecutorial argument, resulted in plain error that affected the substantial rights of the defendant. Tenn. R.Crim.P. 52(b). Those errors were also compounded by the use in this case of the felony murder aggravating circumstance, which was held to be error under *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992) (Drowota, J. and O'Brien, J., dissenting). After reviewing the record, we are unable to conclude that the cumulative effect of the errors was harmless beyond a reasonable doubt. Accordingly, the sentence of death is reversed and the case remanded for resentencing.

## FACTUAL BACKGROUND

The defendant was convicted of the felony murder of Monty Clymer, a relief clerk at a Delta Express Market in Hendersonville, Tennessee. Clymer, who worked the midnight shift, was killed sometime between 12:50 and 1:30 a.m. on December 28, 1988. Disarray about the store's counter and injuries to Clymer's body indicated a struggle had occurred. He had been beaten about the face and shot four times: one wound through the back left thigh, one through the back right shoulder, one graze wound to the right shoulder, and one contact wound to the left chest. The wound to the chest had been fatal. No money was missing from the market and $82.00 was found in the victim's wallet.

The key State's evidence in this case was testimony from the defendant's brother-in-law and co-defendant, Joe T. Baker, who had previously pled guilty to Clymer's murder and received a life sentence. Baker testified that on the evening of December 27, 1988, he and the defendant had picked up Chris and Joel Hoosier at a poolroom in Clarksville around 6:30 p.m. According to him, the four

---

1. Tenn.Code Ann. § 39–2–203(i) [now Tenn.Code Ann. § 39–13–204(i) (1991)]—No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

 (2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

 (7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb....

men rode around for awhile and discussed robbing a convenience store "somewhere away from Clarksville." Baker said that the group drove to Springfield, where Baker borrowed four pistols from a man named Tom Sircy, and that Chris Hoosier took a .25 caliber gun, Joel Hoosier a .22, the defendant a .38, and Baker a second .22. Baker related that the four then drove around for hours, wandering between Nashville and Springfield, smoking marijuana mixed with cocaine and looking for an "easy target" until they arrived at the Delta Market in Hendersonville.

When the four entered the market, Baker testified, Joel Hoosier, who was standing by the door, told Clymer to give him the money. Thinking Clymer was reaching for something other than cash, Baker stepped forward and began pistol whipping Clymer about the face. Chris Hoosier was standing behind Baker on the left; the defendant was to Baker's right. According to Baker, he struggled with Clymer until he felt his pistol slipping from his grasp and heard a gun fire. At that point, Clymer loosened his grip on Baker's wrist and fell to the floor. Firing his own pistol, Baker fled the market. Baker testified that for some unknown reason his gun stopped working during this time.

After the other three men returned to the car, Baker testified, Joel Hoosier tried to give Baker some money. Baker testified that before entering the market, none of the group had any money. Baker said that he had refused the money. Baker also told the jury that his companions had agreed with him when he had remarked that he hoped the clerk was dead because he had seen all of them. The four next drove to Springfield, according to Baker, where they gave the defendant's cousin, Lewis Mason, all of the guns except the .25, which Baker kept. Mason was to return the guns to Sircy. After leaving the Hoosiers at their house in Clarksville, Baker said, he and the defendant talked about what had happened. Baker said that when he asked the defendant if he had shot the clerk, the defendant replied that he had and claimed that he had done it because he was afraid the clerk would get Baker's pistol

and Baker would be shot. "[H]e done it for me," explained Baker.

The State offered testimony in corroboration from another witness, Sandy Womack, who said that, on Father's Day 1989, while incarcerated in the Montgomery County Jail, he overheard a conversation between the youngest Hoosier brother, Eric, and the defendant, during which Eric had asked the defendant to tell him some things about the Hendersonville killing. When asked how many people Joe [Baker] said had had a gun in Hendersonville, the defendant told Eric, "We all got one." When asked how far away he had been standing when he shot, the defendant replied, "Two, three, four feet." The defendant also made a remark about his having held the gun "so high" during the episode that it could be seen from any car passing by the market. Womack said that the conversation occurred in the law library at the jail, which was accessible to all the prisoners. Womack also said that, although the defendant was in another wing of the jail, Hoosier was able to converse with the defendant because the steel doors in the law library separating the two wings had a one to two inch space all the way around them. Womack said he was able to overhear the conversation because he was standing near the door.

In addition to Baker and Womack, the State also called the defendant's cousin, Lewis Mason, as a witness. Mason testified that Baker and the defendant borrowed a .22 caliber gun from him twice near the end of 1988. When the gun was returned to him the second time, Mason said, it had a screw missing from the hammer. Mason specifically contradicted Baker's statement that he had given Mason the guns to return to Sircy on December 28, 1988.

None of the fingerprints found at the market nor any other physical evidence from the scene or the automobile driven by the offenders on the night of the killing connected the defendant, Baker, or the Hoosiers to the killing. The murder weapon was never found.

At the scene of the crime, police discovered two spent .22 caliber bullets, two spent .38 caliber bullets, and pieces of a broken trigger

guard. A third .38 caliber bullet was removed from the fatal wound in Clymer's chest. A ballistics expert testified that the fatal wound was a contact wound. He said he was able to make that determination because the bullet had passed through five folds of the victim's shirt fabric. This indicated that the gun was being pressed against the shirt at the time it was fired.

Defense strategy at the guilt phase consisted, for the most part, of testimony or impeachment that called into question the credibility of Baker and Womack and raised doubts about the evidence collected at the crime scene. On cross examination, the defense attorney questioned Baker closely and Baker acknowledged that he had lied repeatedly to both Clarksville and Hendersonville authorities, that he had been convicted of perjury as a result of his testimony at Joel Hoosier's preliminary hearing, that he looked upon the Hendersonville case as a way out of his problems in Clarksville where he was facing a capital trial, that he was willing to say almost anything to avoid the death penalty, that his testimony against Bigbee was part of a plea agreement with the State whereby he received a life sentence, and that he had been dishonorably discharged from the Marines after pleading guilty to forgery, making false statements, and conspiracy to possess and distribute cocaine.

Responses to cross-examination questions revealed that Womack had been convicted of two robberies in Montgomery County in March of 1989 and sentenced to 15 years and 50 years, that he had six robbery charges and an habitual criminal charge pending in Robertson County, and that he was under indictment in Davidson County. Womack admitted that, at least initially, he had cooperated with authorities in hopes of bettering his own situation; however, he denied ever receiving a deal. In response to questions that revealed the charges in Robertson County had been retired after Womack began cooperating with authorities in Sumner County, Womack insisted that retirement of the Robertson County charges was unrelated to his cooperation with Sumner County authorities.

As substantive evidence aimed at destroying the credibility of Baker and Womack, the defense offered the testimony of Tonya Baker, wife of Joe Baker and the defendant's sister. She testified that in either January or February of 1989, her husband instructed her to call the Hendersonville police department and ask them whether it was a man or a woman who had been killed at the Delta Market. She also testified that her husband had asked her to go to the library in Springfield and obtain newspaper articles about the Hendersonville killing. Tonya Baker further testified that she had determined the gender of the victim and related that information to her husband but had not obtained the newspaper accounts he had requested.

With respect to the credibility of Womack, a jailer at the Montgomery County jail testified that in May of 1989, when Womack said he had overheard the conversation between the defendant and Eric Hoosier, the law library was accessible to prisoners only during GED classes or other special programs and that during those times guards were in the room. The jailer also testified that communication between the steel doors separating the two wings of the jail could only be accomplished by screaming because there was no two-inch space around the doors as Womack had testified.

Finally, to show that Baker and Womack's accounts of the killing were in conflict with the physical evidence, the defense relied upon the State's ballistic expert, who testified that the fatal wound, fired from the .38 caliber gun, had been a contact wound. Both Womack and Baker had testified that the defendant was at least two feet away from Clymer when the shot was fired.

Based on all the evidence presented in the guilt phase, the jury found the defendant, Roosevelt Bigbee, guilty of first-degree felony murder during an attempted robbery.

In the sentencing phase of the trial, the State relied upon the evidence presented during the guilt phase and also introduced certified copies of the defendant's previous convictions of first degree felony murder and robbery by use of a deadly weapon in August of 1990, in Montgomery County, Tennessee. In addition to the certified copies of the

convictions, the State presented testimony from Jay Runyon, one of the detectives in charge of investigating the murder in Montgomery County. Runyon informed the jury that the Clarksville murder occurred in a convenience store; that the victim, a forty-year-old female with four children, was the clerk of the store; that the murder occurred at 1:17 a.m.; and that the victim was shot twice but had three bullet wounds to her body, two in her chest and one, a defensive wound, in the palm of her hand.

The defendant presented no proof at the sentencing phase; however, the trial judge allowed his attorney to convey to the jury that the defendant wanted them to know that he was innocent of the murder.

Based on the proof, the jury found the existence of two aggravating circumstances beyond a reasonable doubt. These were: (1) that the defendant had been previously convicted of a violent felony offense and (2) that the murder was committed while the defendant was engaged in attempting to commit a felony, robbery. Tenn.Code Ann. § 39–2–203(i)(2) and (7) (1982). In addition, the jury found that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances and, as a result, sentenced the defendant to death.

## PART I.

### GUILT PHASE—TRIAL ERRORS

#### A. Sufficiency of the Proof

#### 1. Corroboration of Accomplice Testimony

The defendant argues that the evidence is insufficient to support the jury verdict finding him guilty of first degree felony murder because there was insufficient evidence to corroborate the testimony of Baker, an accomplice.

It is well-established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State, resolves all conflicts in favor of the theory of the State, and removes the presumption of innocence. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn.1992). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). Where, as here, the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

It is beyond dispute that in Tennessee a conviction may not be based upon the uncorroborated testimony of an accomplice. *Monts v. State,* 214 Tenn. 171, 379 S.W.2d 34, 43 (1964); *Stanley v. State,* 189 Tenn. 110, 222 S.W.2d 384 (1949). Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as the trier of fact. *Id.* Tennessee courts have discussed the nature of the rule as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*State v. Gaylor,* 862 S.W.2d 546, 552 (Tenn. Crim.App.1992), quoting *Hawkins v. State,* 4 Tenn.Crim.App. 121, 469 S.W.2d 515 (1971); *see also State v. Henley,* 774 S.W.2d 908, 913 (Tenn.1989); *State v. Sparks,* 727 S.W.2d

480, 483 (Tenn.1987); *State v. Carter*, 714 S.W.2d 241, 244–45 (Tenn.1986).

The defendant says that the only evidence in this case corroborating Baker and implicating the defendant in the commission of the crime is Womack's testimony, which should be disregarded as false because it was physically and logically impossible for the conversation between the defendant and Eric Hoosier to have occurred as Womack said it had. These questions about Womack's credibility were presented to the jury during the trial. The credibility of the testimony of the witnesses is entrusted exclusively to the jury as the triers of fact. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984). Likewise, whether a witness's testimony has been sufficiently corroborated is a matter entrusted to the jury. *Stanley v. State*, 222 S.W.2d at 386. The defendant's challenge to the sufficiency of the convicting evidence is without merit.

### 2. Inadequate Instructions

■ Defendant next says the verdict is invalid because the trial court judge did not instruct the jury to consider the testimony of an informer (Womack) or an accomplice (Baker) with greater care and caution than that used to examine the testimony of other witnesses. In the present case, the defendant did not object to the instructions given regarding accomplice testimony or credibility of witnesses, and no special requests were made for the cautionary instructions defendant now argues were necessary. Although, as the State notes, the defendant's failure to object or assert the issues now assigned as error amounts to waiver of these issues for purposes of appellate review, we have considered them and find that the court's charge fully and fairly stated the applicable law. *See* Tenn.R.App.P. 3(e) and 36(a); Tenn. R.Crim.P. 30(b). Thus, the defendant's argument is without merit.

In *Stanley v. State, supra*, this Court concluded that it is not necessary that a jury be charged to receive accomplice testimony with caution, because "[i]t seems to us that when the trial judge charges the jury as he did, that conviction could not be had upon the unsupported testimony of [an accomplice],

that this within itself was tantamount to telling the jury that the testimony was not favored in the law to the same extent as that of an unbiased witness...." 222 S.W.2d at 388; *see also State v. Hutchison*, 1994 WL 242632 (Tenn.1994).

Likewise, when viewed in context, the charge given the jury regarding the credibility of other witnesses fully and fairly states the law. In the event of conflicting statements made by different witnesses the jury was charged to "reconcile them, if you can, without just rashly concluding that any witness has sworn falsely, for the law presumes that all witnesses are truthful." The instruction given by the trial court was a correct statement of the law. *See e.g. State v. Lee*, 634 S.W.2d 645 (Tenn.Crim.App.1982); *State v. Glebock*, 616 S.W.2d 897 (Tenn.Crim.App. 1981); *Hull v. State*, 553 S.W.2d 90 (Tenn. Crim.App.1977).

### 3. Missing Witness Instruction

■ The defendant last argues that the trial court judge erred in denying his request that the missing witness instruction be given with regard to Joel Hoosier. In support of this argument, the defendant says that Hoosier had earlier received immunity from prosecution by the State, that this grant of immunity indicates his testimony would have "favored" the State and that his testimony would have been material because he was an accomplice. The trial court denied the defendant's request because Joel Hoosier was available to either side as a witness.

Before the missing witness rule can be invoked, the evidence must show that "the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial." *State v. Middlebrooks*, 840 S.W.2d at 334–35, quoting *Delk v. State*, 590 S.W.2d 435, 440 (Tenn.1979). Since Hoosier was equally available to either party and there is nothing in the record to indicate that a relationship existed between the State and Hoosier that would naturally incline Hoosier to testify favorably for the State, the trial

court's ruling was correct, and the defendant's claim is without merit.

## B. Impartial Jury

█ The defendant next insists that he was denied his right to an impartial jury under the 6th and 14th Amendment to the United States Constitution and Article I, §§ 8 and 9, of the Tennessee Constitution. Essentially, the defendant, a black man, claims that juror Ricky Gregory demonstrated racial prejudice against him. He bases that claim on Gregory's wearing a T-shirt that read "Southern Justice" and on Gregory's actions when the sentencing verdict was announced.

On March 14, 1991, the next-to-last day of trial, Gregory appeared at the court house wearing a T-shirt with the words "Southern Justice" noticeably printed on it. At the court's request, Gregory changed his shirt; however, Gregory informed the court that he was a member of a band named "Southern Justice." The defendant refused the court's offer to replace Gregory with an alternate juror.

On the next day, when the sentence was announced, Gregory was allegedly seen raising his right arm with his fist clenched and quickly lowering it as if pulling the handle on an electric switchbox. At the same time he allegedly uttered the word, "Yeah." Gregory and three other jurors were later seen hugging the victim's sister-in-law and brother in the hallway of the courthouse. In its findings on this issue at the hearing on the Motion for New Trial, the court interpreted Gregory's actions as his reaction to the verdict, which the court felt was the result of adequate deliberation; therefore, the trial court overruled the defendant's request for a new trial on this issue.

█ During his individual voir dire, Gregory expressly stated that he could be impartial. Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced. *State v. Caughron,* 855 S.W.2d 526, 539 (Tenn.1993). The record in this case does not support the defendant's claim of bias or prejudice. This issue is without merit.

## C. Suppression of Statement to Eric Hoosier

█ The defendant contends that even assuming he made statements to Eric Hoosier which were overheard by Sandy Womack, testimony regarding those statements should have been suppressed because Womack was acting as an agent for the State when he instigated the deceptive interrogation of the defendant while the defendant was in custody and represented by counsel. Defendant says the statements were obtained in violation of his rights of due process, assistance of counsel, and against self-incrimination. He also urges the Court to exercise its supervisory powers to "remedy the improprieties that have occurred in the prosecution of this case."

The defendant filed no pretrial motion to suppress these statements. He did not object to Womack's testimony on these grounds at trial, nor did he raise this issue in his motion for new trial; therefore, the State argues waiver. Tenn.R.App.P. 3(e) and 36(a); *State v. Coker,* 746 S.W.2d 167, 173 (Tenn.1987).

Relying on *State v. Duncan,* 698 S.W.2d 63, 67–68 (Tenn.1985), and *State v. Martin,* 702 S.W.2d 560, 564 (Tenn.1985), the defendant argues that the appellate review mandated by Tenn.Code Ann. § 39-2-205 [now § 39-13-206] requires this Court to consider any alleged error, whether called to the trial court's attention or not.

As in *State v. Duncan, supra,* we have reviewed the record in this case in light of the defendant's complaint and conclude that here, as in that earlier case, there is nothing in the record to support the contentions of the defendant. In the absence of an objection or motion challenging the evidence on the grounds now asserted, the proof was not focused by either party so as to delineate fully the critical issue of whether or not Womack was acting as an agent for the State. *See State v. Duncan,* 698 S.W.2d at 68. On this record, the defendant's claim is without merit.

### D. Admission of Evidence

The defendant next complains that the trial court erred in several respects in admitting certain evidence at trial. Initially we note that the admissibility of evidence is a matter within the discretion of the trial court, whose decision will not be reversed on appeal absent a showing of abuse of discretion. *State v. Harris,* 839 S.W.2d 54, 66 (Tenn. 1992).

■ The first piece of evidence objected to is a loaded .22 caliber pistol and holster found under the back seat of a patrol car in which the defendant and Chris Hoosier had been seated before they were transferred to Hendersonville from the Montgomery County Jail on September 16, 1989. The gun could not be traced to any of the suspects or to anything at the crime scene. The trial court ruled, nevertheless, that the gun was admissible for the reasons given by the State at the suppression hearing—flight, attempt to escape, consciousness of guilt—to show intent, mental status "and so forth, without elaborating." This gun and its discovery during the transfer of the defendant are irrelevant, as the State concedes on appeal. *See* Tenn.R.Evid. 401, 404(b). The State argues, however, that any error was harmless since proof of the defendant's guilt was overwhelming.

We agree with the State that the error in this instance was harmless. Tenn.R.Crim.P. 52(a). The defense attorney was given wide latitude in eliciting statements on cross-examination and in offering substantive testimony for the purpose of demonstrating how extremely difficult, if not impossible, it would have been for either the defendant or Chris Hoosier to smuggle a loaded gun and holster out of the Montgomery County jail. Therefore, we conclude that the error in admitting the irrelevant evidence was harmless because it does not "affirmatively appear to have affected the result of the trial on the merits." [2] Tenn.R.Crim.P. 52(a).

We observe, however, that this case illustrates the utility and purpose of Tennessee Rule of Evidence 404(b) which provides that before evidence of prior bad acts is admitted, the trial court must hold a jury out hearing, determine that the evidence is relevant to a material issue other than character, state on the record the *specific* issue to which the evidence is relevant, and conclude that the prejudicial effect of the evidence does not outweigh its probative value. Not only does the admission of irrelevant bad acts evidence have a high potential for prejudice, the testimony required to establish, as well as rebut, the prior bad act can substantially lengthen a trial, as this case demonstrates. Rule 404(b) should be followed closely to avoid prejudicing the rights of the accused and to maintain the focus of the trial.

■ Next, the defendant complains of the admission into evidence of a .22 caliber revolver twice loaned to Baker and the defendant by defendant's cousin, Robert Mason, at the end of 1988. Although bullets fired from .22 and .38 caliber weapons were found at the crime scene, the State's TBI firearms expert testified that none of the .22 bullets could have been fired from the .22 admitted at trial. The trial court ruled on the admissibility of this evidence at a hearing on a pre-trial motion in limine made on behalf of Baker by his attorney. With regards to Baker, the trial court found the evidence admissible to show that Baker had access to guns when the offense occurred. The present defendant's lawyer asked whether this ruling applied to the defendant, and the court said it could only rule on that question at trial. The defendant made no objection to this evidence at trial. The State argues waiver. We have considered the defendant's argument and conclude it is without merit.

The record shows that two .22 caliber weapons were used in the crime and that Robert Mason was involved in their procurement. All .22 bullets retrieved from the crime scene were fired from the same gun; therefore, the failure to connect Mason's .22 to these bullets did not eliminate it as one of

---

**2.** The defendant contends that even if the error is harmless as to guilt, it was not harmless as to sentencing. We disagree. There was no mention of the erroneously admitted evidence during any portion of the penalty phase of the trial. Thus, we conclude that its admission was harmless as to sentencing as well.

the two .22 caliber guns used in the robbery. There was no testimony Joel Hoosier had fired the .22 revolver he had gotten from Sircy and Baker. Thus, although the relevancy of the evidence was marginal, we cannot say that its probative value was substantially outweighed by its prejudicial effect. Accordingly, we conclude that the trial court judge did not abuse his discretion in admitting the evidence. *See* Tenn.R.Evid. 403; *State v. Harris, supra.*

■ Finally, defendant says that the trial court erred in allowing the jury to see a video of the crime scene, a short portion of which showed the victim's body and face as they appeared several hours after the murder. Defendant asserts that this part of the tape was cumulative in light of the numerous photographs of the body and that it was inflammatory and lacked probative value. The admissibility of videotapes of a crime scene is within the sound discretion of the trial judge, and his ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion. *State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn.1993). Though the challenged portion of the tape is unpleasant because it shows postmortem lividity and some rigor mortis, the trial court did not abuse its discretion in allowing that part of the videotape to be played. *See* Tenn.R.Evid. 403; *State v. Evans,* 838 S.W.2d 185 (Tenn.1992); *State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

## E. Failure to Supply Exculpatory Evidence

Defendant claims that because the police, prior to trial, withheld from the defense knowledge of the existence of identifiable fingerprints and a footprint, he could not effectively use this evidence in his defense at trial. The defendant alleges that this action by the police violated his statutory right to discovery, orders of the trial court, and his constitutional rights under *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which held that impeachment evidence falls within the *Brady* rule.

A hearing was held on this issue, which was raised in the motion for new trial. The record discloses that two conferences were held between the attorneys for defendant[3] and representatives of the State, including the State's attorneys and law enforcement officers, to review the materials sought in discovery by the defendants. Defendant was informed that none of the fingerprints found at the crime scene implicated the defendant, Baker or any other suspect named by Baker.

Apparently there was a misunderstanding between defense counsel and the State concerning the nature of the fingerprints that had been found. Defense counsel testified that police had led them to believe that the latent prints lifted at the scene were unidentifiable smudges when there were actually identifiable prints among them, although none were ever matched with any known individual. The officers denied they had told defense counsel that the prints were smudges and testified that they had never showed defense counsel the photographs of the fingerprints because counsel had never asked to see them. The fact that there were identifiable prints taken from the scene that had not been identified as belonging to any person was brought out at trial.

In his brief on appeal, the defendant argues that the evidence *excludes* him and the other suspects, and says that if he had known there were identifiable fingerprints not belonging to the four suspects he would have pursued those fingerprints. Defendant also contends that, had he known that an examination of the prints by the Metropolitan Nashville Police Department had excluded him as the person who had made the fingerprints, he would have called the Department's latent fingerprint examiner as a defense witness and he would have cross-examined Joe Baker in detail as to where he had been in the store and what he had touched.

Defendant also apparently complains of not being advised until the middle of the trial that the police had excluded the four suspects as the persons who had left two foot-

**3.** At the first conference on July 12, 1990, counsel for Baker and Chris Hoosier were also pres-

cnt.

prints at the scene of the crime. The police had reached this conclusion after seizing all tennis shoes owned by the four men and comparing them to the footprint patterns.

The trial court found that the evidence alleged to have been withheld by the State was not suppressed and had in fact been brought out at the trial; therefore, the defendant's motion for a new trial on that ground was overruled.

In order to prove a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defendant must establish that the prosecutor suppressed discoverable information, that such information was of a favorable character for the defense, and that the suppressed information was material. *State v. Evans*, 838 S.W.2d at 196. We find no evidence in this record to support a *Brady* violation. The record shows no intentional withholding of any exculpatory evidence but rather a misunderstanding between the State and the defense lawyers. The evidence allegedly withheld was in fact brought out at trial. The evidence did not exclude the defendant; it merely did not implicate him. Having found no prosecutorial misconduct, this issue is without merit.

Defendant also complains that argument by the State at the guilt phase concerning the defendant's lack of knowledge of these prints prejudiced him. During closing argument defense counsel had argued that the fingerprint photographs had suddenly appeared at trial and that it would have been "nice to have known ... ahead of time" that these prints excluded the defendant and his companions. The State responded by arguing that defense counsel would have the jury believe that he had just learned that there had been fingerprints taken by the Metropolitan police that did not match the defendant's prints and that the State had withheld evidence. The prosecutor added that in actuality defense counsel had known for two years that the State had found no prints matching the defendant's. Defendant says the State was arguing that defense counsel was lying, but the record shows that the prosecutor's statement was fair rebuttal of defense counsel's remarks. *See State v. Workman,* 667

S.W.2d 44, 51 (Tenn.1984); *State v. Sutton,* 562 S.W.2d 820, 823–824 (Tenn.1978). This issue is without merit.

### F. Victim Character & Impact Evidence

The defendant argues that the admission of evidence and argument concerning the victim's character and the impact of his death at the guilt phase of his trial violated his rights under the 14th Amendment to the United States Constitution and Article I, §§ 8 and 9, of the Tennessee Constitution. The defendant first complains of the testimony of the victim's seventeen-year-old daughter concerning herself and her family and of the introduction of a photograph of her father. Defendant also complains of testimony from the store manager about the victim's job, his wages and his status as a good employee. No objection was made to this evidence at trial and this issue was not raised on motion for new trial. The State argues waiver. *See* Tenn.R.App.P. 3(e). We have considered the defendant's complaint, however, and find any error to be, at most, harmless.

A reading of the record reveals that the evidence complained of was far from extensive, and it was not prejudicial. The daughter's testimony was properly introduced to show that she had spoken with her father by telephone around 11:30–11:45 p.m. the night of his death. *See State v. Hurley,* 876 S.W.2d 57, 67 (Tenn.1993). The relevance of the store manager's testimony is not entirely clear from the record, primarily because the defendant never challenged its admission and thereby require that its relevance be established. However, the testimony was brief and straightforward, and any error in its admission was harmless. *See State v. Hensley,* 656 S.W.2d 410 (Tenn.Crim. App.1983).

A cause for greater concern is the State's argument to the jury about the victim, reminding them of the children he had left behind, of the fact that he was working during the holidays to support his family when the crime occurred, and suggesting that holding the defendant accountable was a way to do justice.

■ It is beyond dispute that the State may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury, *see, e.g., Sparks v. State,* 563 S.W.2d 564, 569 (Tenn.Crim.App.1978); 23A C.J.S. *Criminal Law* § 1270(c) (1989). Taken in context and read as a whole, however, the argument in this case, although error, was not so inflammatory that it more probably than not prejudiced the jury's verdict. *See* Tenn.R.App.P. 36(b); Tenn.R.Crim.P. 52(a). We do not approve this argument by our holding, however, and caution the State against repeating it in the future.

## PART II.

### SENTENCING

### A. Prosecutorial Misconduct

Defendant contends that prosecutorial argument during the penalty phase led to an arbitrary and unreliable sentence in violation of the 8th and 14th Amendments to the United States Constitution and Article I, §§ 8 and 16, of the Tennessee Constitution.

In particular, the defendant says that his sentence should be reversed because of prosecutorial argument: 1) portraying him as the actual killer in both the Sumner County murder and the murder in Montgomery County for which he had been previously convicted of first-degree felony murder; 2) emphasizing the character of the victim of the Montgomery County murder and the impact of her death on her family; 3) informing the jury that the defendant had received a life sentence for the Montgomery County murder and pointing out the futility of imposing a second life sentence; 4) implying that the defendant should be sentenced to death in this case as punishment for the Montgomery County killing; 5) appealing to the jury to react out of vengeance; 6) claiming that the death penalty is a general deterrent; and 7) comparing imposition of the death penalty with the juror's civic and patriotic duty. The State correctly points out that, with the exception of the victim character and impact argument, no objection was raised to any of these occurrences at trial, nor were they raised in the motion for new trial.

Courts have recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. *State v. Cone,* 665 S.W.2d 87, 94 (Tenn.1984). When a prosecutor's argument strays beyond the wide latitude afforded, the test for determining whether reversal is required is whether the impropriety "affected the verdict to the prejudice of the defendant." *Harrington v. State,* 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). Factors relevant to that determination include:

(1) the conduct complained of viewed in light of the facts and circumstances of the case;

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper arguments;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength and weakness of the case.

*State v. Buck,* 670 S.W.2d 600, 609 (Tenn. 1984); *Judge v. State,* 539 S.W.2d 340, 344 (Tenn.Crim.App.1976). We have adhered to these guiding principles in our evaluation of the defendant's claims.

■ We have examined the record in light of the claims of error and conclude that the sentence must be reversed. Tenn. R.Crim.P. 52(b). Informing the jury that the defendant received a life sentence as punishment for his conviction of first-degree felony murder in Montgomery County was in direct contravention of this Court's holding in *State v. Smith,* 755 S.W.2d 757, 767 (Tenn.1988) ("Smith I"). That error was further compounded by admitting into evidence the underlying facts of the defendant's previous conviction of first-degree murder, including testimony from Jay Runyon, one of the detectives in charge of investigating the Montgomery County murder. Specifically, Runyon informed the jury that the murder occurred around 1:17 a.m. in a Montgomery County convenience store when Vada Langston, the clerk and forty-year-old mother of four, had been shot and killed. Runyon explained that, while only two shots had been

fired, Langston had been wounded three times, once in her hand and twice in her chest.

During closing argument, the prosecutor not only discussed the sentence imposed as a result of the Montgomery County conviction but also extensively referred to the facts of the Montgomery County murder, the character of the victim of that killing and the impact of her death upon her family, and, finally, implied that imposition of the death penalty in this case would be an appropriate way to punish the defendant's previous conviction of the Montgomery County murder. Excerpts of the improper prosecutorial closing argument are set forth below.

Ladies and gentlemen, Vada Langston was killed on January 9th, 1990—1989, excuse me, just 12 days, 12 days, after Monty Clymer was killed here. She was 40 years old. She had four children. She was found lying behind the counter with two bullet holes in her chest and one bullet hole in her hand. Two shots had been fired, one through the chest and the other was a defensive measure or covering her chest. She'd been shot twice. She was, like I told you about Monty Clymer, she was innocent as the driven snow. Seventy-three dollars was taken for her death. . . . He was convicted on August 24th, 1990, for first-degree murder and received a life sentence.

. . . .

I anticipate in a few minutes the defense will ask for mercy for the life of Roosevelt Bigbee. . . . There was nobody there on January 9th 1990, to ask for mercy for Vada Langston, none of her children, none of her family. Nobody was there when she was shot the first time to ask for mercy for her life. There was nobody there from her family to ask for mercy when she was shot the second time. Nobody to ask for mercy for her.

Ladies and gentlemen, you can't escape the fact that Roosevelt Bigbee has killed two completely innocent human beings, never to see their families again, never afforded the opportunity to ask for mercy. Were [sic] not talking about one life, ladies and gentlemen. We're talking about two lives.

. . . .

Ladies and gentlemen, the death penalty is the ultimate punishment in society. It's a punishment and for the protection of society. The only way to stop the Roosevelt Bigbees of this world who have killed more than one person, for those who have no respect for law and order and doing right, and for the lives of others, and to stop the madness and the innocent slaughter of convenience store clerks making an honest, decent living completely unprotected is the death penalty.

Later, in rebuttal, the State argued:

We have got two people that are dead because of what Mr. Bigbee did, and Mr. Baker—Mr. Bigbee is here on trial. Two people that are dead. Seven children that are left without parents.

. . . .

Now, ladies and gentlemen, another thing is Mr. Bigbee has already received a life sentence, a life sentence. He's in prison now serving a life sentence. What's another life sentence going to do? Nothing. He's already got a life sentence. Another life sentence is no skin off his nose. What does the death of Monty Clymer mean if he gets a life sentence under these circumstances? How many people would it take to be killed at a cash register before Roosevelt Bigbee would be deserving of the death penalty?

. . . .

The death of Vada Langston and armed robbery, three wounds that she suffered, a defensive wound or clutching wound, think of that. Think of Monty Clymer. Decide what is the proper punishment in this case. Is it enough just to give him another life sentence? he already has a life sentence. Is it enough? To say we value the human life of Monty Clymer, of Vada Langston, and any human life that's being taken under these circumstances so much that we're imposing the appropriate punish-

ment as set out in Tennessee law, that's the death penalty.

In *Smith I, supra,* this Court found that the failure of a trial court to sever the trials of the defendant's two charges of felony murder at two separate markets was harmful error as to sentencing. Primarily, the error resulted from the fact that the sentencing jury was made aware that the defendant had received a life sentence for one of the murders. The prejudicial effect of making the jury aware of the life sentence was discussed in *Smith I,* as follows:

> We think it clear, as insisted by the defendant, that evidence of the defendant's involvement in the Pierce case necessarily affected the jury's deliberation concerning punishment in the Webb case. As a practical matter, making known to the jury the defendant's involvement in the Pierce case and his punishment in that case effectively eliminated the option of life imprisonment as a sentence for defendant in the Webb case. It opened the door for the State's attorney to argue in the sentencing phase of the Webb case that "to give life, a punishment of life, in this second killing is the equivalent of giving no punishment at all." We think that the prejudice to the defendant is obvious and the defendant's punishment in the Webb case should have been determined without regard to the Pierce case or the punishment to which the defendant was sentenced in that case. The only way to insure that the defendant's punishment in the Webb case would be determined on the merits of that case and without regard to the Pierce case was for the trial judge to have granted the motion for severance of the two offenses. In denying that severance, the trial judge committed reversible error.

*Id.* at 767.

Despite this Court's holding in *Smith I,* evidence of the life sentence was again admitted at the sentencing hearing conducted after remand. Once again, the defendant appealed and challenged admission of the evidence. This Court again reversed and remanded for a new sentencing hearing, stating, "[w]e are deeply troubled about the overall effect of the admission of evidence of the *sentence* in the Pierce case at the sentencing hearing in the second trial." *State v. Smith,* 857 S.W.2d 1, 24 (Tenn.1993) ("*Smith II*").

Despite the State's contention in *Smith II* that the issue had been waived by the defendant's failure to object and despite "[t]he suggestion that the failure to object was a strategic maneuver by the defense to obtain a life sentence," *id.* at 25, we determined that the error had prejudicially affected the sentence and declined to attribute the failure to object to defense strategy stating, "[t]he issue of whether either or both counsel were attempting to sandbag the other is a matter of pure speculation." *Id.* We think that statement adequately addresses the arguments made by the State in this case as well. Admitting evidence of the sentence imposed upon the defendant as a result of the Montgomery County conviction was error in this case for the reasons stated in *Smith I* and *Smith II, supra. See also State v. Jones,* 789 S.W.2d 545, 552 (Tenn.1990); *State v. House,* 743 S.W.2d 141, 147 (Tenn.1987).

 The error was compounded, however, by the testimony of Detective Runyon. Evidence of facts regarding a previous conviction to show that it in fact involved violence or the threat of violence to the person is admissible at a sentencing hearing in order to establish the aggravating circumstance. *State v. Bates,* 804 S.W.2d 868, 879 (Tenn. 1983); *State v. Moore,* 614 S.W.2d 348, 351 (Tenn.1981).[4] However, it is not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or the threat of violence to the person. *Id.* In this case, Detective Runyon was permitted to testify as to the facts upon which the defendant's previous convictions were based.

 Furthermore, although argument and evidence regarding the victim of this

---

**4.** The law interpreted in *Bates* and *Moore* has since been amended. *See* Tenn.Code Ann. § 39– 13–204(i)(2) (1991 & Supp.1993).

crime is not precluded by either the state or federal constitutions, *see Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Brimmer,* 876 S.W.2d 75, 86 (Tenn.1994), evidence and argument regarding the victim of a crime other than the crime for which the defendant is being sentenced is irrelevant and inadmissible. *Cf. Cozzolino v. State,* 584 S.W.2d 765, 767–68 (Tenn.1979) (State's evidence is limited to establishing statutory aggravating circumstances unless other evidence is necessary to respond to the defendant's proof). Here, Detective Runyon testified about the family situation of the victim of the Montgomery County murder, and the State seized upon that testimony in its closing argument to the jury. Detective Runyon's testimony and the prosecution's argument regarding the victim of an unrelated crime were inadmissible and improper.

■ The prosecutor also engaged in improper argument by strongly implying during argument that imposition of the death penalty in this case would be an appropriate way to further punish the defendant for the Montgomery County killing, for which he had already received a life sentence. *See Lesko v. Lehman,* 925 F.2d 1527, 1545–46 (3d Cir. 1991); *Cf. Rogers v. Lynaugh,* 848 F.2d 606, 611 (5th Cir.1988) (prosecutor's argument that jury's sentence should include punishment for prior felony convictions constituted violation of double jeopardy); *Knight v. State,* 190 Tenn. 326, 229 S.W.2d 501, 503–504 (1950) (reversible error in prosecutor's argument that defendant should be convicted for the good of society on general principles because he was guilty of crimes other than that for which he was being tried).

Obviously, the State may argue that the existence of the prior conviction as an aggravating circumstance supports imposition of the death penalty; however, in this case, the State's argument went beyond that limit and strongly implied, without flatly stating, that the defendant should be sentenced to death as additional punishment for the previous conviction. The defendant had already been tried, convicted and separately sentenced for that crime. Argument encouraging this jury to impose an additional punishment was improper.

■ Finally, the prosecutor strayed beyond the bounds of acceptable argument by making a thinly veiled appeal to vengeance, reminding the jury that there had been no one there to ask for mercy for the victims of the killings in Sumner and Montgomery Counties, and encouraging the jury to give the defendant the same consideration that he had given his victims. Although the prosecutor could have properly counseled the jury to avoid emotional responses that were not rooted in the trial evidence, *see California v. Brown,* 479 U.S. 538, 542–43, 107 S.Ct. 837, 839–40, 93 L.Ed.2d 934 (1987), the argument here encouraged the jury to make a retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence. As such, the argument was improper. *Lesko v. Lehman,* 925 F.2d at 1545.

■ Though each of the errors discussed above might have been harmless standing alone, we find that, considered cumulatively, the improper prosecutorial argument and the admission of irrelevant evidence affected the jury's sentencing determination to the defendant's prejudice. Therefore, we conclude that the sentence of death must be reversed and the case remanded for a new sentencing hearing. In addition to the specific areas of argument discussed above, the State should also avoid the subject of general deterrence during argument at the new sentencing hearing. *See State v. Irick,* 762 S.W.2d 121, 131 (Tenn.1988).

Due to the necessity of a remand, only those issues which may become relevant at the new sentencing hearing will be discussed below. Other issues are pretermitted.

### B. Instructional Errors

#### 1. Deterrence

■ The defendant avers that the trial court erred when it refused to instruct the jury not to consider during its deliberations the deterrent effect of the death penalty nor the cost of maintaining a prisoner for life in prison. While neither of these factors should enter a capital jury's sentencing determination, *cf., e.g., State v. Irick,* 762 S.W.2d 121, 131 (Tenn.1988); *State v. Johnson,* 632

S.W.2d 542, 547–48 (Tenn.1982), this Court has never required such an instruction. We conclude that the trial court's instruction that the jury must only take into account those aggravating circumstances proven beyond a reasonable doubt and no other facts or circumstances as a basis for deciding whether to impose the death penalty was appropriate and sufficient to foreclose consideration of any irrelevant matters. There is no merit to this issue.

### 2. Lingering Doubt

 Defendant also insists that he was entitled to an instruction that the jury may consider as a mitigating circumstance "any residual or lingering doubt you may have about [defendant's] guilt, if in fact you have such doubt." The Eighth Amendment of the United States Constitution does not require a lingering or residual doubt instruction. *See Franklin v. Lynaugh,* 487 U.S. 164, 173–74, 108 S.Ct. 2320, 2326–28, 101 L.Ed.2d 155 (1988). In so concluding, the United States Supreme Court stated:

> Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. [Citations omitted.] "Residual doubt" is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." Petitioner's "residual doubt" claim is that the States must permit capital sentencing bodies to demand proof of guilt to "an absolute certainty" before imposing the death sentence. Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

*Id.,* 487 U.S. at 189, 108 S.Ct. at 2335 (O'Connor, J., concurring).

We agree with the U.S. Supreme Court's analysis of the issue and conclude that the trial court did not err in denying the defendant's request for an instruction on "lingering or residual" doubt.

We should point out, however, that "[a]t a resentencing hearing, both the State and defendant are entitled to offer evidence relating to the circumstances of the crime so that the sentencing jury will have essential background information 'to ensure that the jury acts from a base of knowledge in sentencing the defendant.'" *State v. Adkins,* 725 S.W.2d 660, 663 (Tenn.1987), quoting *State v. Teague,* 680 S.W.2d 785, 788 (Tenn.1984); *see also State v. Nichols,* 877 S.W.2d 722, 731 (Tenn.1994). On remand, that right should be afforded this defendant.

### 3. Disparity of Treatment of Co–Defendants

 The defendant next complains that he was entitled to an instruction informing the jury to consider, as a mitigating circumstance, the fact that Joe Baker had received a sentence less than death in exchange for his cooperation with authorities, despite the fact that he was equally blameworthy and had a prior history of criminal activity. Though not included in the special request, on appeal the defendant asserts that the jury should have been told about the disposition of the case with regard to Chris and Joel Hoosier as well. Again, we find no error with the trial court's denial of the instruction. The jury, during the course of the trial, did learn about Baker's prior criminal record and the fact that he had received a life sentence in exchange for his cooperation.

Moreover, the jury was told that Joel Hoosier had been granted immunity from prosecution and was informed that Chris Hoosier had not yet been tried. The catch-all instruction was given, which allowed the jury to consider any fact in evidence favorable to the defendant. There is no merit to this issue. On remand, however, the defense should not be precluded from presenting this information as part of the essential background necessary to an individualized sentencing determination.

### 4. Life Sentence Based on Mercy

Defendant next complains that the trial court erred in refusing to instruct the jury

that it could sentence the defendant to life based on mercy and also challenges the constitutionality of the standard "no-sympathy" instruction used in this and other cases. We have repeatedly held that no error occurs when a trial court refuses to give a mercy instruction. *See State v. Hartman,* 703 S.W.2d 106, 119 (Tenn.1985); *State v. Melson,* 638 S.W.2d 342, 366 (Tenn.1982). We have also on numerous occasions upheld the "no-sympathy" instruction against constitutional attack. *See State v. Cazes,* 875 S.W.2d 253, 268 (Tenn.1994); *State v. Harris,* 839 S.W.2d 54, 75 (Tenn.1992). There is no merit to this issue.

### 5. Definition of Life and Death Sentence

Defendant also claims that he was entitled to an instruction informing the jury that a sentence of life means life and death means death. This Court has previously held that such an instruction is not required. *State v. Caughron,* 855 S.W.2d 526, 543 (Tenn.1993); *State v. Payne,* 791 S.W.2d 10, 21 (Tenn. 1990).

### 6. Omission of the Beyond-a-Reasonable-Doubt Standard

■ Equally without merit is the defendant's claim that the trial court erred by charging the jury according to the statute as it existed at the time of the offense in 1988, rather than according to the statute as amended in 1989 and in effect at the time of the trial in 1991. The instruction given tracked the language of the statute in effect at the time of the offense and required the jury to conclude that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances before it could impose a sentence of death. *See* Tenn.Code Ann. § 39–2–203(g) (1982). The amended statute requires that, to impose a death sentence, the jury must find that the aggravating circumstances proven by the State outweigh, beyond a reasonable doubt, any mitigating circumstances. *See* Tenn. Code Ann. § 39–13–204(g) (1991).

We recently held in *State v. Brimmer,* 876 S.W.2d 75, 81–82 (Tenn.1994), that where an offense is committed before November 1, 1989, the effective date of the 1989 amend-ment changing the weighing standard, but where the trial and sentencing occur after that effective date, a trial court does not err by instructing the jury under the statute as it existed at the time the offense was committed. Here, under the rationale of *Brimmer,* because the offense occurred in December of 1988, instructing the jury according to the pre–1989 statute was appropriate. This issue is without merit.

### 7. Meaning and Function of Mitigating Circumstances

Defendant also faults the trial court for failing to inform the jury as to the meaning and function of mitigating circumstances. We have previously rejected the argument that such an instruction is required. *See State v. Brimmer,* 876 S.W.2d at 83; *State v. Groseclose,* 615 S.W.2d 142, 147–48 (Tenn. 1981).

### 8. Violation of Mills v. Maryland

The defendant lastly alleges that there is a reasonable likelihood that the jury could have understood the instruction given in this case as requiring that it unanimously agree on the existence of mitigating circumstances in violation of the holdings of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). This Court has previously rejected the same argument and we reaffirm those holdings and find this issue without merit. *See e.g., State v. Nichols,* 877 S.W.2d at 734–35; *State v. Harris,* 839 S.W.2d 54, 74 (Tenn. 1992); *State v. Bates,* 804 S.W.2d 868, 882 (Tenn.1991).

### C. Middlebrooks Error

■ Sometime after the trial of this case, a Court majority concluded in *State v. Middlebrooks,* 840 S.W.2d 317, 346 (Tenn.1992) (Drowota and O'Brien, JJ., dissenting), that, when a defendant is convicted of felony murder, the State's use of felony murder as an aggravating circumstance at the sentencing hearing violates Article I, Section 16, of the Tennessee Constitution and the Eighth Amendment of the federal constitution because the aggravating circumstance is a duplication of the crime itself and does not narrow the class of death-eligible defendants

as is constitutionally required. This Court, as presently constituted, has reconsidered the *Middlebrooks* holding, and a majority today re-affirms the principle announced in *Middlebrooks*. Therefore, it is indisputable that the sentencing jury's consideration of the invalid felony-murder aggravating circumstance in this case was state constitutional error. Because unrelated error requires a remand for a new sentencing hearing in this case, it is not necessary that we determine whether the *Middlebrooks* error was harmless beyond a reasonable doubt. *See State v. Howell*, 868 S.W.2d 238 (Tenn.1993). At the new sentencing hearing, however, the State may not rely on the felony murder aggravating circumstance.

Although conceding its inapplicability to this case, the dissent argues that the Tennessee first degree murder statute, as amended in 1989, is a constitutionally valid narrowing device. According to the dissent, inclusion of the term "reckless" within the substantive definition of the offense of first-degree murder, combined with a judicial construction of the statute to require defendants to have participated in a substantial way in the underlying felony, comports with the proportionality requirement enunciated by the United States Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and, therefore, accomplishes narrowing.

Initially, we point out that the Court majority in *Middlebrooks* considered the effect of the 1989 amendment and rejected the arguments that the dissent now advances as novel. *See State v. Middlebrooks*, 840 S.W.2d at 345. Moreover, the "saving construction" urged by the dissent is not consistent with the well-established rule that:

> Criminal statutes must be strictly interpreted, both with respect to the act charged as the offense and the penalty imposed. It is axiomatic that statutes creating and defining crimes cannot be extended by intendment. Before a man can be punished, his case must be plainly and unmistakably within a statute. As liberty and perhaps life are involved, every rea-

sonable doubt must be resolved in favor of the defendant.

*State ex rel. Inman v. Brock*, 622 S.W.2d 36, 46 (Tenn.1981), quoting 1 *Wharton's Criminal Law And Procedure* § 19 (12 Ed.1957).

Accordingly, we disagree with the analysis employed by the dissent; however, even assuming, for purposes of argument and of federal constitutional law, that the finding required by *Tison* is sufficient narrowing, for the reasons stated below it is not sufficient as a matter of state constitutional law.

The defendant here, as was the case in *Middlebrooks*, was convicted of felony-murder under the pre–1989 law which defined first-degree murder as follows:

> Every murder perpetrated by means of poison, lying in wait, or by other kinds of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb....

Tenn.Code Ann. § 39–13–202(a) (1982 & Supp.1988) (emphasis added).

In 1989, the statute was amended to define first-degree murder as:

> (2) A *reckless* killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, or aircraft piracy; [or]
>
> (3) A *reckless* killing of another committed as the result of the unlawful throwing, placing, or discharging of a destructive device or bomb[.]

Tenn.Code Ann. § 39–13–202(a)(2) and (3) (1991).

The word "reckless" is defined as:

> the actions of one who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard

constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as reviewed from the accused person's standpoint.

Tenn.Code Ann. § 39–11–106(a)(31) (1991).

The dissent asserts that the legislative insertion of the term "reckless" into the substantive definition of first-degree felony murder in combination with a judicial interpretation of the statute to require substantial participation, accomplishes narrowing under the principles announced in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), *Enmund,* and *Tison, supra.*

Certainly, the United States Supreme Court in *Lowenfield* established that states may accomplish constitutional narrowing either by providing restrictive definitions of first-degree or capital murder or by utilizing aggravating circumstances at the sentencing hearing. As we stated in *Middlebrooks,* however, Tennessee has not chosen to narrow at the definitional stage. In fact, prior to 1989 Tennessee was a felony murder simpliciter state—one of only five with the broadest definition of first degree felony murder.

We also said in *Middlebrooks,* that "since the absence of reckless indifference constitutionally immunizes a defendant from the death penalty, its presence cannot meaningfully further narrow the class of death-eligible defendants." *State v. Middlebrooks,* 840 S.W.2d at 345. Accordingly, unlike the dissent, we do not consider it "irrelevant as a matter of federal constitutional law" that the felony murder aggravating circumstance duplicates the elements of the underlying offense.

Moreover, assuming for argument's sake that, as a matter of federal constitutional law, the dissent is correct in asserting that minimal narrowing is accomplished by defining first-degree felony murder to require a *mens rea* of recklessness, that is not sufficient narrowing to satisfy Article I, Section 16, of the Tennessee Constitution. This is so because all felony murderers potentially meet a recklessness standard and all are, therefore, potentially eligible for the death penalty. Compliance with Article I, Section 16 requires that the class of persons *eligible* for the death penalty be genuinely narrowed to justify imposition of a more severe sentence on the defendant as compared to others found guilty of murder. *State v. Middlebrooks,* 840 S.W.2d at 345.

When a defendant is convicted of first-degree felony murder, genuine narrowing as required by Article I, Section 16, is not accomplished by Tennessee's broad definition of first-degree felony murder. Thus, we reaffirm our holding in *Middlebrooks* that, when a defendant is convicted of first-degree felony murder, the aggravating circumstance set out in Tenn.Code Ann. §§ 39–2–203(i)(7) (1982) and 39–13–204(i)(7) (1991), which merely duplicates the elements of the offense and does not accomplish genuine narrowing as required by Article I, Section 16, of the Tennessee Constitution, may not be relied upon by the State to seek imposition of the death penalty.

We also disagree with the dissent's position that our holding in *Middlebrooks* was not based on independent and adequate state grounds. Although federal authority was considered and discussed in our analysis, primary reliance for our interpretation of Article I, Section 16, of the Tennessee Constitution in *Middlebrooks* was placed upon similar decisions from North Carolina and Wyoming. *See State v. Middlebrooks,* 840 S.W.2d at 341–43 (citing and discussing *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979) and *Engberg v. Meyer,* 820 P.2d 70 (Wyo.1991)). In addition, we also relied upon Tennessee statutes that prohibit duplication in non-capital sentencing and concluded that Article I, § 16, imposed the same prohibition in capital cases. *State v. Middlebrooks,* 840 S:W.2d at 341 (citing Tenn.Code Ann. § 40–35–111 (1982) and § 40–35–114 (1990)). Simply put, the *Middlebrooks* decision was based adequately and independently on the Tennessee Constitution. We continue to adhere to its mandate.

### D. Chronological Order

■ The defendant next avers that the district attorney general deliberately delayed the trial of this offense in Sumner County

until after the trial in the Montgomery County case to provide an aggravating circumstance. The defendant contends that allowing a prosecutor the discretion to organize the order of trials violates his due process rights. We disagree. As we recently decided in *State v. Nichols, supra,* "[f]or purposes of this aggravating circumstance, [previous conviction of felony involving violence], the order in which the crimes were actually committed is irrelevant so long as the convictions have been entered before the sentencing hearing at which they were introduced." 877 S.W.2d at 736. This issue is without merit.

## CONCLUSION

We have carefully considered the defendant's contentions as to alleged errors occurring during the guilt phase of the trial and conclude that none have merit. The conviction is affirmed.

We have determined that the cumulative effect of errors occurring during the sentencing phase, including improper prosecutorial argument and the admission of irrelevant evidence, was prejudicial and more probably than not affected the sentence imposed. Accordingly, the sentence of death must be reversed and the case remanded for a new sentencing hearing. All aspects of the new sentencing hearing should be conducted in conformity with this Opinion.

Because of the remand for resentencing, we pretermit statutory review of the proportionality of the death sentence imposed against the defendant as otherwise required by Tenn.Code Ann. § 39–13–206(c)(1)(D) (1991) [formerly Tenn.Code Ann. § 39–2–205(c)(4) ], and decline to address the defendant's challenges to the death penalty statute, all of which have been repeatedly and recently rejected by a majority of this Court.

BIRCH, J., concurs.

REID, J., concurs with separate opinion.

O'BRIEN, C.J. and DROWOTA, J., concur and dissent with separate opinions.

REID, Justice, concurring.

The procedure in Tennessee whereby the sentence of death is executed consists of three steps. *See State v. Howell,* 868 S.W.2d 238, 265 (Tenn.1993) (Reid, C.J., concurring). This case involves only the first two steps, which are not clearly delineated in the concurring and dissenting opinions.

The first step is the determination that the person to be executed is a member of the class of death-eligible murderers. Under the federal constitution a sentence of death may be imposed only,

> where a defendant kills, attempts to kill, or intends that a killing take place, or that lethal force will be imposed, or where a defendant's personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life. *Tison v. Arizona,* 481 U.S. 137, 157–158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987); *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982); *State v. Branam,* 855 S.W.2d 563, 570–71 (Tenn.1993); *State v. Middlebrooks,* 840 S.W.2d 317, 338 (Tenn.1992).

*State v. Howell,* 868 S.W.2d 238, 265 (Tenn. 1993) (Reid, C.J., concurring). Prior to the 1989 amendment to T.C.A. § 39–13–202, that statute, which defines first degree murder, did not include the "reckless disregard" provision of the definition found to be essential in *Tison v. Arizona. See* T.C.A. § 39–2–202 (1982). The 1989 amendment only conformed the statute to the minimum standard of death-eligible defendants required by the United States Constitution. Tennessee's first degree murder statute, as amended in 1989, remains the most unrestricted definition of a class of death-eligible defendants permitted under the federal constitution.[1] *State v. Middlebrooks,* 840 S.W.2d 317, 337–38, *cert. dismissed,* —— U.S. ——, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993).

The federal constitution does not permit all death-eligible defendants to be executed. It requires that states adopt procedures for

---

**1.** Tennessee has imposed by statute and court decisions, other limitations on the imposition of the sentence of death which exceed the minimum standard required under the United States Constitution. *See State v. Howell,* 868 S.W.2d 238, 267–68 (Tenn.1993) (Reid, C.J., concurring).

selecting from among the death-eligible class, those for whom the sentence of death is most appropriate. *Gregg v. Georgia,* 428 U.S. 153, 187–95, 96 S.Ct. 2909, 2932–35, 49 L.Ed.2d 859 (1976). Therefore, in Tennessee a second step is necessary. Tennessee accomplishes this second step by the application of enhancing and mitigating factors at the sentencing phase of the trial. *See* T.C.A. § 39–13–204(i), (j) (Supp.1994).

However, some states, unlike Tennessee, combine the first and second steps in a restrictive statutory definition of capital murder. The decision in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1987), was based upon a restrictive statutory definition of capital murder. In *Lowenfield,* the United States Supreme Court, after stating the result mandated by the constitution, described two methods which could be used to accomplish that result:

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition.

. . . . .

It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person."

*Id.* 484 U.S. at 246, 108 S.Ct. at 554–55 (citations omitted). First degree murder in Louisiana, when *Lowenfield* was decided, required the finding of specific intent. *Id.* 484 U.S. at 241–43, 108 S.Ct. at 553. The culpability of the defendant in *Lowenfield* is similar to that of a defendant in Tennessee who is convicted of premeditated murder (T.C.A. § 39–13–202(a)(1)) and found at sentencing to have knowingly created a great risk of death to two or more persons other than the victim (T.C.A. § 39–13–204(i)(3)).

There is no "interaction of the principles" found in *Lowenfield* and *Enmund* and *Tison*[2]. The class of death-eligible defendants defined in *Enmund* and *Tison* is not restricted or narrowed by the 1989 amendment to T.C.A. § 39–13–202(a). Further narrowing, by statute as in *Lowenfield,* or by the use of aggravating circumstances as in Tennessee, is constitutionally required before the sentence of death can be executed. The 1989 amendment to the Tennessee statute did not alter the constitutional principles on which *Middlebrooks* was based and provides no support for the proposition that this Court should retreat from the carefully crafted decision in *Middlebrooks.*

O'BRIEN, Chief Justice, concurring and dissenting.

While I agree in principle with the concurring and dissenting opinion by my colleague, Justice Drowota, I write separately to express my personal disagreement with the majority opinion in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992). *Middlebrooks* held it to be in violation of the Tennessee Constitution, Article I, § 16, to use the felony murder aggravating circumstance, T.C.A. § 39–2–203(i)(7) (1982) or T.C.A. § 39–13–204(i)(7) (1991), to sustain imposition of the death penalty for a conviction of felony murder, although it can be used to support impo-

2. Justice Drowota concurring and dissenting at p. 825.

sition of the death penalty for premeditated murder. It was held that the use of the felony murder aggravating circumstance duplicated the elements of the underlying crime and failed to narrow the class of death-eligible murders as required by Article I, § 16 of the Tennessee Constitution. Since the Eighth Amendment of the United States Constitution and Article I, § 16 of the Tennessee Constitution are identical in language, it is incomprehensible to me how the use of the felony murder aggravating circumstance which duplicated the elements of the underlying crime could be construed to be constitutional under the United States Constitution and not under the Tennessee Constitution.

In this case defendant was found guilty of the offense of first degree felony murder in an attempt to perpetrate a robbery. The lead opinion mandates reversal for, among other reasons, the use of the felony murder aggravating circumstance, which was held to be error in the *Middlebrooks* case.

In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), a case based on the Louisiana capital sentencing statute, the petitioner raised fundamentally the same charge of error under consideration here, that is that the sole aggravating circumstance found at the jury sentencing phase was identical to an element of the capital crime for which he was convicted. Louisiana has a very similar narrowing statute as that created by the legislature in this State. Tennessee has established five (5) statutory grades of homicide: First Degree Murder; Second Degree Murder; Manslaughter, Voluntary and Involuntary; and Vehicular Homicide. The punishments for these offenses are graded according to the nature of the offense. First degree murder is defined so as to include only a narrow class of homicide, the punishment for which is death or imprisonment for life with the sentence to be fixed by the jury in a separate sentencing hearing to determine which shall apply upon a finding of guilt. A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and outweighs any mitigating circum-

stance the jury may find. Otherwise the sentence shall be life imprisonment.

In discussing the exact same issue we have before us the *Lowenfield* court said:

"It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase ... Here the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three (3) counts of murder under the provision that the 'offender had a specific intent to kill or to inflict great bodily harm upon more than one (1) person.' ... The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances in the exercise of discretion.[1] The Constitution requires no more."

The Legislature in this State has further narrowed the sentencing process in cases in which a sentence of death has been imposed. The statutes provide that the sentence of death is automatically reviewed by this Court even though a defendant convicted of first degree murder does not appeal the conviction. T.C.A. § 39–13–206. The Court first considers assigned errors and then proceeds to review the sentences of death. The statute requires the Court to determine whether (1) the sentence of death was imposed in any arbitrary fashion; (2) the evidence supports the jury's finding of statutory aggravating

---

1. The Tennessee Legislative scheme follows the same procedure.

circumstance or circumstances; (3) the evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; (4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the nature of the crime and the defendant. In addition to its other authority regarding correction of errors, the Court, in reviewing the death sentence for first degree murder, is authorized to: (A) affirm the sentence of death; or (B) modify the punishment to life imprisonment.

I am satisfied that the judgment in this case meets both State and federal constitutional requirements. Insofar as the narrowing function is concerned. Otherwise, I concur in Justice Drowota's concurring and dissenting opinion.

DROWOTA, Justice, concurring and dissenting.

I concur with part I, Sections A–F of the majority opinion.

I agree that this case must be remanded to the trial court for resentencing because of the prosecutorial misconduct; therefore, I concur in Part II–A of the majority opinion. However, I respectfully dissent from Part II–C of that opinion, in which the Court reaffirms its *State v. Middlebrooks,* 840 S.W.2d 317, 346 (Tenn.1992) holding that when a defendant is convicted of felony murder, the State's use of the felony murder aggravating circumstance to impose the death penalty violates Art. I, § 16 of the Tennessee Constitution because the aggravating circumstance duplicates the elements of the underlying offense and thus fails to "narrow" the class of death-eligible offenders. Although I filed a dissent in *Middlebrooks,* I wish here to further develop the grounds on which I believe the holding of the *Middlebrooks* majority to be in error.

## DISCUSSION OF RELEVANT UNITED STATES SUPREME COURT CAPITAL PUNISHMENT JURISPRUDENCE

The capital punishment jurisprudence of the United States Supreme Court since its landmark decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) may be described in terms of two overarching objectives. First and foremost, the Supreme Court has sought to *standardize* capital sentencing schemes by requiring the States to formulate clear standards to guide and limit the sentencing body's discretion in imposing the death penalty. This process of standardization is intended to "minimize the risk of wholly arbitrary and capricious action" by the sentencing body in its determination of whether to impose the death penalty. *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976); *see also Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Second, the Court has sought to *individualize* capital sentencing schemes by requiring the States to allow the sentencing body full access to any evidence that might serve to assist in the sentencing determination, such as evidence of the defendant's character and the circumstances of the crime. *See Eddings v. Oklahoma,* 455 U.S. 104, 110–12, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 601–605, 98 S.Ct. 2954, 2963–2965, 57 L.Ed.2d 973 (1978); *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 636–37, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637 (1977). This process of individualization serves to increase the sentencing body's discretion. *See generally* Stephen Gillers, *Deciding Who Dies,* 129 U.Pa.L.Rev. 1 (1980).

The Supreme Court has stated in several opinions that the standardization of the States' capital sentencing schemes serves the function mandated by the Eighth Amendment of "narrowing" the class of death-eligible offenders; in other words, standardization serves to circumscribe the unfettered discretion that existed in the sentencing body prior to *Furman. Zant v. Stephens,* 462 U.S. 862, 876–77, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). A proper "narrowing device" must accomplish two distinct objectives. First, it must provide standards that are sufficiently determinate to guide and channel the sentencing body's discretion. *Arave v. Creech,* 507 U.S. ——, ——, ——, 113 S.Ct. 1534, 1540–41, 123 L.Ed.2d 188 (1993); *Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047,

3057, 111 L.Ed.2d 511 (1990); *Lewis v. Jeffers,* 497 U.S. 764, 774, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606 (1990); *Maynard v. Cartwright,* 486 U.S. 356, 363–64, 108 S.Ct. 1853, 1858–59, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980). The fact that the narrowing device is determinate, however, does not end the inquiry because the device must also provide a principled basis for distinguishing those defendants convicted of murder who deserve capital punishment from those who do not. *Arave,* 507 U.S. at ——, 113 S.Ct. at 1542. If the narrowing device is so broad that it could be interpreted by the sentencing body to apply to every murder, it is not constitutionally valid. *Cartwright,* 486 U.S. at 364, 108 S.Ct. at 1859; *Godfrey,* 446 U.S. at 428–29, 100 S.Ct. at 1765.

The Supreme Court has afforded the States a significant amount of flexibility in fashioning devices to narrow the class of death-eligible offenders. The Court's decision in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), exemplifies this commitment to federalism in the realm of capital punishment jurisprudence. In *Lowenfield,* the petitioner was convicted under Louisiana's murder statute, which enumerates a narrowly defined "laundry-list" of first-degree murders. La.Rev.Stat.Ann. § 14:30 A (West 1986). The subsection under which the petitioner was convicted defined first-degree murder as the killing of a human being "when the offender has a specific intent to kill or inflict great bodily harm upon more than one person." La.Rev.Stat. Ann. § 14:30 A(3). After a separate sentencing hearing, the jury found a sole aggravating circumstance—that "the offender knowingly created a risk of death or great bodily harm to more than one person," La.Code Crim.Pro.Ann. Art. 905.4(d)—and sentenced the petitioner to death. Because Louisiana law provided that these provisions were to be construed in a "parallel fashion," *see State v. Williams,* 480 So.2d 721, 726–27 (La.1985), there was no dispute that evidence supporting a conviction under § 14:30 A(3) automatically established the aggravating circumstance enumerated in Article 905.4 of the Louisiana Code of Criminal Procedure.

The petitioner challenged his conviction, arguing that because the sole aggravating circumstance found by the jury duplicated the elements of the underlying offense, Louisiana's capital sentencing scheme failed to meaningfully narrow the class of death-eligible offenders as required by the Eighth Amendment. A six-member majority of the Court rejected this argument, holding that Louisiana's "laundry-list" of first-degree murders satisfied the narrowing requirement of the Eighth Amendment because it rationally and meaningfully differentiated between the defendants who deserved capital punishment and those who did not. This holding therefore obviated Louisiana's entire scheme of aggravating circumstances as a matter of federal constitutional law. The majority stated its holding as follows:

> It seems clear to us ... that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: the legislature may itself narrow the definition of capital offenses, as ... Louisiana ha[s] done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase [citation omitted].

*Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555.

To further emphasize its holistic view of the narrowing function, the Court stated:

> *The use of aggravating circumstances is not an end in itself, but a means of narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.*

*Lowenfield,* 484 U.S. at 244–45, 108 S.Ct. at 554 (emphasis added).

With these fundamental principles of the narrowing function required by the Eighth Amendment clearly in mind, we now turn to an examination of the Supreme Court's application of these principles to the felony murder doctrine. Two cases—*Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d

1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)—are crucial for a proper resolution of the issue addressed by the Court in *Middlebrooks*.

In *Enmund* the petitioner was convicted under the Florida felony-murder statute because of his involvement in a robbery in which an elderly couple was killed. The record in the case revealed that petitioner Earl Enmund drove Sampson and Jeannette Armstrong to the home of Thomas and Eunice Kersey and remained in the car while the Armstrongs knocked on the door. When Thomas Kersey appeared, the Armstrongs grabbed him and demanded his money. Mr. Kersey then yelled for help, and Eunice Kersey came out of the house with a shotgun. She fired the gun at Jeannette Armstrong and wounded her. At that point, Sampson and possibly Jeanette Armstrong shot and killed both the Kerseys, took their money, and fled. Although the evidence established that Earl Enmund drove the Armstrongs away from the scene of the crime, there was no evidence that he knew that the Armstrongs had intended to kill the Kerseys.

Under the Florida felony murder statute and capital punishment sentencing scheme, a defendant found guilty of felony murder could be put to death without any proof whatsoever as to his mental state. The jury found Enmund guilty of felony murder, and it recommended that he be put to death; the trial court accepted this recommendation. The Florida Supreme Court affirmed the conviction and sentence of death.

Before the United States Supreme Court, Enmund argued that the Eighth and Fourteenth Amendments prohibited a State from imposing the death penalty on a person convicted of felony murder when that person did not kill, attempt to kill, intend to kill, or know that lethal force would be used. In determining whether the punishment was cruel and unusual, the Court first sought to identify the prevailing societal attitude as to whether the death penalty was an excessive sanction for felony murderers like Enmund by analyzing the actions of state legislatures and lay juries on the issue. After analyzing the states' felony murder and capital sentencing statutes, the Court found that only eight states allowed a person who was involved in a robbery in which a person was murdered to be sentenced to die simply for his involvement. The Court then surveyed the actions of juries in sentencing persons convicted of felony murder who did not themselves commit the murder, and discovered that only a tiny fraction of convicted felony murderers had been sentenced to death in the absence of evidence of their participation in the killing or a finding of intent to kill. With this evidence in mind, the Court conducted its own proportionality review and concluded that the legitimate goals of capital punishment—deterrence and retribution—were not served when a person convicted of felony murder is sentenced to death in the absence of proof that the person killed, attempted to kill, or intended that life would be taken. Specifically, the majority stated that because American criminal law has always insisted that punishment must be commensurate with the intent of the perpetrator, Florida's capital sentencing scheme was constitutionally deficient because it treated Enmund, who did not intend that a killing take place, in the same manner as the actors in the underlying felony who did intend to kill.

The Court returned to the theme of culpability in a felony murder situation five years later in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In *Tison*, petitioners Ricky and Raymond Tison brought several concealed weapons into the Arizona State Prison to free Gary Tison, their father, who was serving time for the murder of a prison guard. The Tison brothers were successful in freeing their father and Randy Greenawalt, their father's cellmate. As the men were driving through the desert, a tire on their Lincoln automobile blew out. Raymond Tison then flagged down a Mazda, which was occupied by John Lyons, his wife, and their young son and niece. The men forced the Lyons' family into the Lincoln and drove both cars off the road into the desert. At some point the men transferred their belongings to the Mazda; however, thereafter they parked the Mazda and continued to drive the Lincoln deeper into the desert. After stopping the Lincoln,

Gary Tison ordered the Lyons' family out of the car. At that time, John Lyons begged the group not to kill them; and he asked that the group give them some water and leave them in the desert. Gary Tison responded to the plea by instructing Raymond and Ricky Tison to return to the Mazda and get some water. As Ricky and Raymond Tison returned with the container of water, Gary Tison and Greenawalt opened fire on the Lyons' family, killing all four. There was no dispute that both Ricky and Raymond Tison saw the murders and did nothing to assist the victims. The group continued their escape attempt in the Mazda until they were apprehended several days later by a police roadblock.

Both Raymond and Ricky Tison were convicted under the Arizona felony murder statute and were sentenced to death; and the Arizona Supreme Court affirmed the convictions. The Tisons then collaterally attacked the convictions in post-conviction proceedings, arguing that the Supreme Court's decision in *Enmund v. Florida* required their convictions to be reversed because they did not kill, attempt to kill, or intend that the victims be killed. A divided Arizona Supreme Court rejected this argument, holding that the *Enmund* "intent to kill" requirement had been satisfied because the Tisons intended, contemplated, or foresaw that life would be taken in the escape scheme.

The Supreme Court granted certiorari for the purpose of determining whether the death sentence was constitutionally valid under the dictates of *Enmund*. In its analysis, a five-member majority of the Court first disavowed the analysis employed by the Arizona Supreme Court; it stated that the Arizona court's definition of "intent" was more akin to "foreseeability" than to the traditional notion of specific intent as used in *Enmund*. And the majority conceded that the Tisons did not "intend to kill" as that concept had been traditionally understood. Therefore, it also conceded that petitioners did not fall within the category of felony murderers for whom the *Enmund* court explicitly held the death penalty to be constitutionally permissible.

That admission, however, did not settle the issue because the majority went on to state that the Tisons also did not fit within the category of felony murderers for whom the *Enmund* court had held the death penalty to be constitutionally impermissible: those felony murderers who, like Enmund, had not participated in the crimes in a major way and who had no culpable mental state. The Court contrasted petitioners' actions of securing the weapons, participating in the jailbreak, trapping the victims, and failing to help them in the face of their impending death with Enmund's comparatively innocuous role as the driver of the "getaway" car. Because it believed that the Tisons' actions could be construed as exhibiting a reckless indifference to human life, the Court recast the issue as whether the Eighth Amendment prohibits the imposition of the death penalty upon a person convicted of felony murder who has exhibited recklessness and whose participation in the underlying felony can be said to have been major rather than minor.

The majority answered this question in the negative. After surveying the state felony murder and capital punishment statutes, the court held that only a small minority—eleven states—forbade the imposition of the death penalty where the defendant acted with recklessness and played a substantial role in the underlying felony. The majority then specifically addressed the culpability issue that was so essential to the holding in *Enmund*. Although it agreed with the *Enmund* court that punishment must be closely tailored to the culpable mental state of the perpetrator, the majority rejected petitioners' argument that only a classic intentional, premeditated murder is deserving of the death penalty. Justice O'Connor, writing for the majority, reasoned as follows:

A narrow focus on the question of whether or not a defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all—those who act in self-defense or with other justification or excuse. Other intentional homicides, though criminal, are often felt undeserving of the death penalty—those that are the result of prov-

ocation. On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of a robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill." Indeed it is for this very reason that the common law and modern criminal codes alike have classified behavior such as occurred in this case along with intentional murders [citation omitted]. *Enmund* held that when "intent to kill" results in its logical though not inevitable consequence—the taking of human life—the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

. . . . .

We will not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here. Rather, *we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement.*

*Tison,* 481 U.S. at 157–58, 107 S.Ct. at 1687–88 (emphasis added).

Several principles can be derived from the *Lowenfield, Enmund,* and *Tison* decisions. First, it is clear that a State need not employ a scheme of aggravating circumstances in order to fulfill the narrowing mandate of the Eighth Amendment; that mandate can be fulfilled by a narrow definition of the offenses themselves if the offenses are both sufficiently determinate and provide a principled basis for differentiating between convicted persons who deserve capital punishment and those who do not. Moreover, it is abundantly clear after *Tison* that the death penalty may be imposed in a felony murder situation if the defendant exhibits recklessness and plays a substantial role in the underlying felony.

## PART I

In *Middlebrooks,* I applied these principles to our felony murder aggravating circumstance, Tenn.Code Ann. § 39–13–204(i)(7),[1] which, like the first degree murder statute that included felony murder, Tenn.Code Ann. § 39–13–202(a),[2] was at that time (1987) unqualified by either the culpability or participation requirements of *Tison.* Although this deficiency did serve to deprive the jury of the opportunity to decide whether the felony murder aggravating circumstance, as modified by the *Tison* requirements, applied in a defendant's case (because the jury was not informed of the *Tison* requirements in the charge), I did not believe this was sufficient to render the aggravating circumstance unconstitutional because I felt that any constitutional error made by the jury in applying the open-ended felony murder aggravating circumstance could be corrected by this Court on direct appeal. *Middlebrooks,* 840 S.W.2d at 349. Moreover, because we had rejected essentially the same argument as

---

1. In 1987, at the time Middlebrooks was charged, § 39–13–204(i)(7) provided as follows: The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb[.]

2. In 1987, § 39–13–202(a) provided as follows:

 Every murder perpetrated by means of poison, lying in wait, or by other kinds of wilful, deliberate, malicious, and premeditated killing, *or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb* ... (emphasis added).

that propounded by Middlebrooks in *State v. Smith*, 755 S.W.2d 757, 768 (Tenn.1988), a post-*Tison* case, I believed that the doctrine of stare decisis demanded that we adhere to the position previously taken on this issue. *Id.* at 347. Because I continue to believe that the felony murder aggravating circumstance is constitutional, even when it and the definition of felony murder are unqualified by any culpability or participation requirement, I dissent from the holding in Part II–C of the majority opinion.

## PART II

As stated above, I still believe that my *Middlebrooks* dissent was correct because of the doctrine of stare decisis; and I also think that it was a correct analysis of federal constitutional law. However, I wish here to set forth another argument which, although not specifically applicable to the case at hand,[3] even more strikingly illustrates the fallacy of the *Middlebrooks* majority's conclusion that our felony murder aggravating circumstance violates Art. I, § 16 of the Tennessee Constitution because it duplicates the elements of the underlying offense.

In 1989 the General Assembly amended § 39–13–202(a) by defining as first degree murder:

(2) A *reckless* killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, or aircraft piracy; [or]

(3) A *reckless* killing of another committed as the result of the unlawful throwing, placing, or discharging of a destructive device or bomb[.]

Tenn.Code Ann. § 39–13–202(a)(2) and (3) (emphasis added).

The legislative insertion of "recklessness" into the felony murder portions of § 39–13–202(a) is crucial because the interaction of the principles announced in *Lowenfield, Enmund,* and *Tison* appears to lead inexorably to one conclusion: that a definition of felony murder which includes the *Tison* requirements of recklessness and a substantial de-

gree of participation in the underlying felony is a constitutionally valid narrowing device because it is both determinate and because it provides a principled basis for distinguishing between those defendants who deserve to die and those who do not. As to the determinacy prong of the test, there is no question that such a definition is sufficiently determinate to guide and channel the sentencing body's discretion—this is especially apparent when a *Tison*-type definition of felony murder is contrasted with the types of narrowing devices that have been held to be unconstitutionally vague. See cases cited on p. 3–4, *supra.* As to the second prong of the test, Justice O'Connor's opinion in *Tison* explains with remarkable lucidity and power the reasons that such a definition does provide a rational, meaningful method of separating those defendants who deserve the death penalty from those who do not. Felony murderers who recklessly engage in criminal activity that poses grave danger to others may be much more dangerous to society than some intentional murderers. I am in total agreement with Justice O'Connor's vigorous rejection of the simplistic view that only intentional or premeditated murders are deserving of the death penalty. *See Middlebrooks*, 840 S.W.2d at 347.

This does not settle this question, however, for while Tennessee's current definition of felony murder obviously includes the culpability requirement set forth in *Tison*, it does not include the second requirement of *Tison*—that the defendant's participation in the felony have been substantial. Therefore, standing alone, the statute does not seem to satisfy the dictates of *Tison* and therefore does not qualify as a constitutionally valid narrowing device.

However, it is a well-settled rule of statutory construction that a court may, indeed must, apply a saving construction to a statute of questionable constitutionality if the saving construction is rational and is within the realm of the intent of the legislature. *State v. Lyons,* 802 S.W.2d 590 (Tenn.1990); *State ex rel Maner v. Leech,* 588 S.W.2d 534 (Tenn. 1979). Because the General Assembly

---

**3.** The argument set forth in Part II is not applicable to this case because Bigbee was indicted

prior to the effective date of the 1989 amendment.

amended the felony murder statute in 1989 by inserting the word "reckless," it is obvious that the legislature was attempting to ensure the constitutionality of the statute by conforming it to the dictates of *Tison*. Therefore, given the legislature's intent in amending the statute, it is but a small step to construe the statute to require the defendant to have participated in a substantial way in the underlying felony before he can be convicted of felony murder and therefore become death-eligible. Therefore, I would construe the statute in that manner. And I would require that the jury be charged to that effect.

With the aid of the above mentioned saving construction, I believe that §§ 39–13–202(a)(2) and (3) constitute a valid narrowing device under federal constitutional law. While this conclusion does not end the inquiry as a matter of state constitutional law, it is of tremendous persuasive force, particularly since we have rejected more restrictive approaches to this issue in the past while deferring to the pronouncements of the Supreme Court. *See e.g., State v. Smith*, 755 S.W.2d 757, 768 (Tenn.1988).

I believe that when considered in light of my argument dealing with the 1989 amendment to the first degree murder statute, the weakness of the *Middlebrooks* majority's analysis of the relevant federal law becomes apparent. A primary reason for this conclusion is the majority's treatment of the *Tison* decision. Although the majority realized that *Tison* provided a "nationwide threshold of culpability at the reckless indifference level, meaning that a defendant who acts without reckless indifference is not constitutionally eligible for the death penalty," *Middlebrooks*, 840 S.W.2d at 345, it went on to say that the *Tison* requirement (the majority did not mention the participation factor also mandated by *Tison* ) did not serve the narrowing function required by the Eighth Amendment because

[a]ll felony murderers ... potentially meet a recklessness standard; that is, one who purposely undertakes a felony that results in a death, almost always can be found reckless. Therefore, the narrowing devices in these states [states requiring proof

of recklessness before the defendant can become death-eligible] are essentially no different from those in pure felony murder states.

*Id.* at 345.

The majority concluded its argument by stating: "[t]herefore, since the absence of reckless indifference constitutionally immunizes a defendant from the death penalty, its presence cannot meaningfully *further* narrow the class of death eligible offenders." *Id.* (emphasis added).

This analysis is flawed in two principal ways. Initially, the majority's assertion that all or "almost all" felony murderers can be found to be reckless—a proposition for which it cited no authority—is simply not the case. As *Tison* itself illustrated, there are felony murderers, such as the petitioner in *Enmund,* who cannot be found to have been reckless, and those defendants are constitutionally immunized from the punishment of death. Thus, the restrictive definition of felony murder in our first degree murder statute does narrow, to some extent, the class of death-eligible defendants.

Second, my argument pertaining to the 1989 amendment of the first degree murder statute substantially undermines another main pillar of the *Middlebrooks* majority's analysis—its argument that the felony murder aggravating circumstance does not *further* narrow the class of death-eligible defendants. Although the majority acknowledged that under *Lowenfield* a State is not required to further narrow the class of death-eligible defendants with the use of aggravating circumstances if it has already adequately narrowed that class by restrictively defining the capital offenses, it determined that *Lowenfield* was inapplicable because while Louisiana had narrowly defined its capital offenses, "Tennessee has a broad definition of murder and has not narrowed in the definitional stage." *Id.* at 346. While the majority is correct that Tennessee does not have a comprehensive scheme of narrowly defined capital offenses as does Louisiana, this fact is immaterial because Tennessee's 1989 definition of felony murder, when construed as I have urged in this dissent, *is* an acceptable narrowing device under the Eighth Amend-

ment. Therefore, the fact that the felony murder aggravating circumstance largely duplicates the elements[4] of the definition of felony murder is irrelevant as a matter of federal constitutional law. With this clearly in mind, the majority's attempt to distinguish *Lowenfield* on the ground that Tennessee has no comprehensive list of narrowly defined capital offenses loses all its persuasive force.

This failure of the analysis employed by the *Middlebrooks* majority to accommodate the concerns prompted by my argument concerning the 1989 amendment is of paramount importance because the *Middlebrooks* majority failed to enunciate "adequate and independent state grounds," *Michigan v. Long*, 463 U.S. 1032, 1037–45, 103 S.Ct. 3469, 3474–78, 77 L.Ed.2d 1201 (1983), for deviating from an ascertainable Eighth Amendment standard. Indeed, it would be extremely difficult to do so because there is nothing in the Tennessee Constitution or in our state's capital punishment jurisprudence that compelled the *Middlebrooks* majority to deviate from such a federal standard. This conclusion is accentuated by the fact that the majority did not discuss any Tennessee decision in its opinion; its analysis was entirely based on federal law. This reliance on federal law is underscored by the fact that the United States Supreme Court granted certiorari in this case;[5] and it was argued by the parties before being dismissed as improvidently granted.[6]

Viewed from this perspective, the *Middlebrooks* majority's sole argument is, and must be, that it is irrational and/or disproportionate for the *Tison*-type felony murderer to enter the sentencing phase of the proceedings with one aggravating circumstance in place while the intentional murderer enters the sentencing phase with no such burden. I would reply only that this delicate, difficult matter is solely one for the determination of the legislature—the most direct link, other than the lay jury, to the moral will of the community. *See Spaziano v. Florida*, 468 U.S. 447, 472–90, 104 S.Ct. 3154, 3168–78, 82 L.Ed.2d 340 (1984) (Stevens, J. dissenting). As Justice O'Connor so ably pointed out in *Tison*, there is nothing inherently irrational about the statement that some felony murderers are much more dangerous than some murderers who kill in an intentional, premeditated fashion. Therefore, there is nothing inherently irrational about the legislature's choice to treat them differently. Moreover, under the argument set forth above, the jury itself will perform the narrowing function in its determination of whether the defendant is guilty of felony murder in the first place, not an appellate court. Because the jury is charged, in a capital case, with the primary sentencing responsibility in Tennessee, its determination as to whether the death penalty may be constitutionally imposed on a defendant is superior to that same decision made by on appellate review by judges, who are by definition more removed from the popular will than are juries. *Spaziano*, 468 U.S. at 486–87, 104 S.Ct. at 3176.

Furthermore, any error that the jury may commit in applying §§ 39–13–202(a)(2) and (3) may still be remedied at another point in the sentencing process. As I pointed out in my *Middlebrooks* dissent, although it is true that a person convicted of a *Tison*-type felony murder automatically has one aggravating circumstance established against him, this does not translate into an automatic sentence of death. The jury still must find that the aggravating circumstances outweigh the mitigating circumstances to impose a sentence of death. Tenn.Code Ann. § 39–13–204(f). And the mitigating circumstances include the statutory factors set forth in § 39–13–204(j), plus any other relevant evidence. § 39–13–

---

4. Of course, the felony murder aggravating circumstance does not totally duplicate the post–1989 definition of felony murder because the definition of felony murder now contains the element of "recklessness" that the aggravating circumstance does not have.

5. —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 466 (1993).

6. Although the United States Supreme Court had denied Middlebrooks's petition to dismiss for lack of jurisdiction, —— U.S. ——, 114 S.Ct. 48, it dismissed the petition, —— U.S. ——, 114 S.Ct. 651, in apparent reliance on our subsequent statement in *State v. Howell*, 868 S.W.2d 238, 259 n. 7 (Tenn.1993) that the decision in *Middlebrooks* was based on Art. I, § 16 of the Tennessee Constitution.

204(j)(9). Furthermore, in any case in which a sentence of death has been imposed, this Court must review that sentence to determine if: (1) the sentence was imposed in an arbitrary fashion; (2) the evidence supports the jury's findings as to the statutory aggravating circumstances; and (3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. § 39–13–206(c)(1)(A), (B) and (C). Finally, this Court must conduct a proportionality review to determine if the sentence of death is excessive or disproportionate when compared to the penalty imposed in similar cases. § 39–13–206(c)(1)(D). In short, the process of sentencing in Tennessee is extremely individualized to ensure that the death penalty is employed in only the most deserving of cases.

Because I believe that the portions of Tennessee's first degree murder statute dealing with felony murder, when construed as I have urged, serve to narrow the class of death-eligible defendants in accordance with federal constitutional requirements, and because I believe that the *Middlebrooks* majority failed to enunciate a compelling justification for deviating from this ascertainable federal standard, I must respectfully dissent from Part–II(C) of the majority opinion.

Notwithstanding that I firmly believe the majority's position on this important issue to be in error, its rejection of the argument set forth in Part II of this dissenting opinion at least serves to finally resolve the uncertainty which has shrouded the felony murder doctrine since the *Middlebrooks* decision was released. Whatever other conclusions one may draw from *Middlebrooks* and the majority opinion in *Bigbee* (Part II–C), this much is now obvious: in the absence of other aggravating circumstances, Article I, § 16 of the Tennessee Constitution does not permit a defendant convicted of felony murder to be put to death without a showing that the defendant exhibited a mental state, with regard to the killing itself, of greater culpability than reckless indifference.

This now unequivocal message does not, however, mean that the felony murder aggra-

vating circumstance, Tenn.Code Ann. § 39–13–204(i)(7), must disappear forever from our criminal law. Just as any statute that has been held to be unconstitutional may be remedied by legislative amendment, so too may § 39–13–204(i)(7). Because both the *Middlebrooks* and *Bigbee* majorities identify the mens rea component of our felony murder scheme as its constitutional deficiency, perhaps one way to remedy the scheme would be to insert a requirement in the aggravating circumstance that the defendant kill with either a "knowing" or "intentional" mental state. See Tenn.Code Ann. § 39–11–302(a) and (b). Although there may be other ways of ensuring the constitutionality of the scheme, this appears to me to be the most straightforward method.[7]

### CONCLUSION

I had initially hoped by this dissent to convince the newest member of this Court, who did not participate in *Middlebrooks*, to join with the *Middlebrooks* dissenters in this decision and thereby correct what I believe to have been an erroneous interpretation of both the state and federal constitutions. I have failed in this endeavor. However, I chose to file this lengthy dissent in the hope that the members of this Court would further clarify their respective positions regarding the constitutionality of our felony murder scheme in light of the 1989 amendment to the felony murder statute. This they have done. I have also filed this dissent to point out that the holdings of the majorities in *Middlebrooks* and the present case should not be interpreted, in my opinion, as forever foreclosing capital punishment for felony murder in this state in the absence of some additional aggravating circumstance. It is abundantly clear, however, that any further action in this important and controversial area of our state's capital punishment jurisprudence will have to be taken by the legislature.

O'BRIEN, C.J., concurs.

---

7. Of course, the definition of felony murder itself could be amended to include one of these mental states. However, because Tennessee already utilizes a scheme of aggravating and mitigating circumstances, it would probably be preferable to amend the aggravating circumstance.