# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## SEPTEMBER SESSION, 1997

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 02C01-9610-CR-00354** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **SHELBY COUNTY** |
| **VS.** | ) | |
| | ) | **HON. CHRIS CRAFT** |
| **MICHAEL T. WARE,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Felony Murder) |

FILED

November 14, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF SHELBY COUNTY

FOR THE APPELLANT:

A. C. WHARTON
Public Defender

WALKER GWINN
Assistant Public Defender
201 Poplar, Suite -01
Memphis, TN 38103

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

GEORGIA BLYTHE FELNER
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

JOHN W. PIEROTTI
District Attorney General

AMY WEIRICH
Assistant District Attorney General
Criminal Justice Complex, Suite 301
201 Poplar Street
Memphis, TN 38103

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Michael T. Ware, was convicted by a Shelby County jury of one count of felony murder.[1] He was sentenced to life imprisonment. He appeals his conviction raising one issue: That the evidence was legally insufficient to support the verdict of guilt. As subparts to this issue, he asserts that the conviction was based on accomplice testimony without sufficient corroboration and that the testimony of the accomplice was essentially "bought" by the prosecution and violative of his due process rights. We affirm the judgment of the trial court.

On the evening of June 17, 1994, the victim in this case, Barry Watts, was at his mother's house repairing a broken taillight on her car around 5:00 or 6:00 p.m. He finished the job in approximately thirty minutes and then left in his car, a Buick Regal. He telephoned his mother at approximately 10:00 p.m. and talked with her.

That same evening, Florene Williams borrowed her boyfriend, Henry Clark's car, a 1976 or 1977 four-door, blue and white Buick LeSabre. She drove the car to visit her friend, Deloris Wilson, at the Cedar Court Apartments on Seventh Street in Memphis, Tennessee. She arrived there between 6:30 and 7:00 p.m. Ms. Williams was socializing, drinking and getting high on crack cocaine. During the evening, Ms. Williams checked on her car two or three times and saw the Defendant and "Sweet Pea" (Corey Hunter) hanging around. They

---

[1]Tenn. Code Ann. § 39-13-202(a)(2).

were agitating to get her car. When she was leaving to go back home, she got in the vehicle and began to remove the "club" from the steering wheel. The Defendant and Hunter approached the car with the Defendant on the driver's side and Hunter on the passenger's side. They threatened Ms. Williams and hit her on the side of the neck and face with a bottle or club. She relinquished the vehicle because she knew the Defendant had a gun. This was somewhere between 8:00 and 10:00 p.m.

Ms. Williams returned to her friend's apartment and stayed within the complex that evening. She did not sleep. Ms. Williams did not report the theft to the police although a pay telephone was nearby because she was afraid of the Defendant and did not want to be seen calling the police.

Meanwhile, the Defendant and Hunter drove the stolen vehicle around until it developed mechanical problems and stopped running. They pulled the car over on Leath Street in front of William Walker's house. Mr. Walker and his family were sitting out in their yard and drinking beer at approximately 11:30 when he saw two black males in the car. Mr. Walker knew the victim, Barry Watts, and saw him pull his car up to the stalled vehicle. The streetlight was dim, but Mr. Walker saw the victim get out of his vehicle and appear to help the two men. He described both of them as six feet tall with slender builds and dark complexions. One man looked like he had long "nappy" hair. It appeared that they first tried to jump start the vehicle, then the two men got into the victim's vehicle. One man sat in the front passenger seat and the other got into the back seat. The victim drove them away. Later, the stalled vehicle was identified as belonging to Henry Clark, who was initially a suspect.

Johnny Broady testified that on June 17, he got off from work at 5:00 p.m. and was near his home at approximately 5:30 p.m. He saw the victim on Bethel Street and the victim stopped his car and talked to him. The victim gave his pager number to Broady. Broady and his friends, including a lady he was entertaining, went to his home on Pearce Street at approximately 6:30 to 7:00 p.m. After about thirty minutes, Broady paged the victim to buy some crack cocaine. The victim delivered the crack to Broady's house at approximately 7:30 or 8:00 p.m. Broady paged the victim one more time at about 10:00 to 10:15 p.m. to buy more crack.

The victim arrived on Pearce Street with the Defendant and Hunter in the car with him. Broady wanted the victim to come in the house, but the victim told Broady to ride with them. Broady was reluctant because he would leave his guests, but agreed to go with the victim. They headed towards Chelsea Street, turned onto Fifth Street, and then stopped at Greenlaw Avenue to drop off the Defendant and Hunter. The men had been talking about buying marijuana. They pulled into the parking lot at Johnson's Market. The victim turned off his headlights before rolling to a stop. Broady opened his door to get out and looked back in. He saw the Defendant pull a gun, either a .45 caliber or 9 millimeter, on the victim and told him to "drop it", in other words, to give the Defendant his money and valuables. Broady testified that Hunter nudged him and held a gun to his head and likewise told him to "drop it." Broady said he didn't have anything. The Defendant fired the pistol at the victim. Broady jumped out of the car and ran behind the market. He grabbed a pipe to protect himself and peeked around the corner to see if anyone was chasing him.

-4-

He saw the brake lights go off and the front car door open. The victim fell out of the car and the Defendant slid into the driver's seat. The car sped off, heading east on Greenlaw Avenue. Broady ran over to the victim along with Darryl Pryor, who had seen the incident from his apartment. Broady did not stay, but told Pryor where he could be found. Broady testified at trial that in a statement to the police, he stated that he never really looked directly at the Defendant because it was dark in the vehicle, but that he saw the Defendant's face from the flash of the gun when it fired. He did not know the Defendant by name at the time of the offense, but testified that he was positive that the Defendant was the individual who shot the victim. He had seen the Defendant from a distance around his neighborhood. While on the stand, Broady described the Defendant's hair as having a jheri curl.

Darryl Pryor testified that he was sitting outside his apartment around 11:00 p.m. when he noticed a car approach and pull into the market. He noticed the vehicle's light go off before it came to a stop. He heard a "pop" and got behind a tree. Although it is unclear whether before or after he heard the gunshot, he saw a black male run from the vehicle. Afterwards, someone was pushed out of the car. The vehicle pulled off and drove down Fifth Street. He went to the victim, who was lying face down and breathing laboriously as if he were suffocating. He spoke with Broady, who did not stay at the scene for long. Pryor called 911.

Police officers arrived at 12:02 a.m and secured the scene. The Defendant was dead when the paramedics arrived. Police recovered seven rocks of crack cocaine in the victim's navel. The medical examiner determined that the victim

died as a result of a gunshot wound to the arm which entered his right lung, severed two major arteries and lodged in his left lung, causing severe bleeding. The gun was fired within twelve inches from the victim.

Corey Hunter, who was with the Defendant during the commission of the crime, testified at trial. He stated that the Defendant lived in the Cedar Court Apartments and he met him there. They wanted to go to a teenager club called 380 Beale. They had no transportation and because it would take thirty minutes to walk there, they wanted a car. He testified that Florene Williams let them use the car in exchange for a rock of crack cocaine. They took the car and it broke down on the way to Beale Street. A heavyset man with dark skin stopped to help and checked under the hood. When they determined the vehicle could not be revived, they asked for a ride. The victim agreed to take them part of the way to Greenlaw Avenue. The victim drove to Broady's house and picked him up. The victim pulled in an alley to drop them off when the Defendant pulled a gun and told him to "Drop it off." The victim said "Uh" because he was startled and the Defendant shot him. The victim fell out of the car onto the street. The back door was open and Hunter wanted to get out, but the Defendant refused. They left the car on Marble Street, then walked to Beale Street. The vehicle found on Marble Street was later identified as the victim's. Hunter was afraid to leave the Defendant because the Defendant had a gun. He finally left the Defendant after they were on Beale Street for a few minutes.

Hunter was later arrested and gave a statement to police. After that, he signed an affidavit that his prior statements implicating the Defendant were false. He testified that the affidavit was made at the behest of the Defendant's gang

members, who had assaulted him in jail. Hunter did not report the assault. The affidavit stated that the police promised to let Hunter go if he implicated the Defendant. Hunter testified that the affidavit was false and that his statement made to the police and his testimony in court was the truth.

Sergeant James Fitzpatrick testified at trial that he took Corey Hunter's statement at the police department. Fitzpatrick denied telling Hunter that he would be released if he identified the shooter.

The Defendant was convicted of first-degree felony murder committed in the perpetration of a robbery and sentenced to life imprisonment. In his only issue in this appeal, he contends that the evidence was insufficient to support the verdict of guilt. When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate

view of the evidence and all inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

A crime may be established by circumstantial evidence alone. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, before an accused may be convicted of a criminal offense based only upon circumstantial evidence, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). In other words, a "web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. at 484, 613.

After a careful review of the record, we find that the evidence proves that the Defendant killed the victim during an attempt to rob him. However, the Defendant argues that the conviction was based on accomplice testimony that was not sufficiently corroborated. He asserts that Hunter was the only witness who witnessed the crime and positively identified the Defendant.

It is well established in Tennessee that a defendant may not be convicted solely upon the uncorroborated testimony of an accomplice. See, e.g., State v.

Bigbee, 885 S.W.2d 797, 803 (Tenn.1994). Such corroborating evidence "may be direct or entirely circumstantial, and need not be adequate, in and of itself to support a conviction," as long as it "legitimately tends to connect the defendant with the commission of the crime charged." Bigbee, 885 S.W.2d at 803 (quoting) State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992). However, "it is not necessary that the corroboration extend to every part of the accomplice's evidence." Id. Also, the corroboration may be sufficient although "the evidence is slight and entitled, when standing alone, to little consideration." Id. Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as the trier of fact. Id.

Furthermore, the threshold question of whether the witness was an accomplice must be answered. An accomplice is one "who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995). The test is whether the alleged accomplice can be indicted for the crime, however, a defense of duress or coercion may be asserted. Id. Establishing whether the witness is an accomplice is a question for the jury. Id.

We believe that the evidence suggests that Hunter may have been an accomplice to the crime. In particular, Broady testified that when the Defendant pulled the gun on the victim, Hunter also pulled a gun and demanded that Broady "Drop it off." Having determined that Hunter was an accomplice, we address whether there was sufficient corroboration of his testimony. Although Hunter was the only witness at the time the crime was committed who knew who the Defendant was, other witnesses sufficiently placed the Defendant at the crime

scene. Florene Williams said the Defendant took her boyfriend's vehicle with Hunter. That same vehicle was seen by William Walker when it broke down. Two black males, one with long hair, left the vehicle and got into the victim, Barry Watts', car. Walker knew the victim and saw the two get in his car. Johnny Broady saw the victim driving his vehicle with two passengers. He did not know the Defendant's name nor did he see him very well, but later identified the Defendant as the man he saw in the car. Darryl Pryor saw a man get pushed out of the car after he was shot. When he saw the man up close, he recognized him as Barry Watts. The vehicle that was abandoned on Marble Street belonged to the victim.

Although there is circumstantial evidence linking the Defendant to the crime, we believe that it provides substantial corroboration of Hunter's testimony. This other evidence legitimately links the Defendant to the crime and clearly leads one to no other conclusion than that the Defendant committed the crime. Obviously, the jury accredited the testimony of the State's witnesses in rendering its verdict. We will not disturb the jury's finding in this appeal.

The Defendant also argues that Hunter's testimony should have been excluded because it was tainted. He argues that the State offered Hunter's freedom in exchange for testimony implicating the Defendant. He proffers evidence that the State issued a nolle prosequi regarding Hunter after he testified at the Defendant's trial. We first note that because the defendant has failed to cite authority to support his argument, this issue is waived. Tenn. Ct. Crim. App. R. 10(b); State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988).

However, even if we were to address this issue, we would conclude that it lacks merit. While there is evidence that Hunter signed an affidavit stating that the police promised that he would not be prosecuted if he identified the Defendant, he explained that he was coerced into writing the statement by the Defendant's gang members. Hunter denied that he was given anything in return for his testimony. Sergeant Fitzpatrick testified that he never made any offers of leniency in exchange for implicating the Defendant. As this Court has noted:

> It is generally recognized that a humble, contrite, and conscientious repentant who 'throws himself upon the mercy of the court' usually fares much better than does the adamant accused who is adjudged guilty after a lengthy trial. While one indicted for crime in the position of cooperating with the government should not be threatened or assured the court will grant favored treatment in return for his assistance, there is no proscription against his hoping that his valuable help will result in leniency.

Graves v. State, 489 S.W.2d 74, 87 (Tenn. Crim. App. 1972). Accordingly, we conclude that this issue is without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JOE B. JONES, PRESIDING JUDGE

_____
JOE G. RILEY, JUDGE

-11-