IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2002

## STATE OF TENNESSEE v. BRIAN ANTIONE STARKS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-A-253     Steve R. Dozier, Judge**

---

**No. M2002-00179-CCA-R3-CD - Filed April 15, 2003**

---

The defendant, Brian Antione Starks, was convicted, by jury, of first degree felony murder and attempted especially aggravated robbery. The defendant was sentenced to life imprisonment for the murder conviction and eleven years as a Range I, standard offender for the robbery conviction, to be served consecutively to the life sentence. The defendant timely appealed, alleging that the evidence was insufficient to support his convictions and that the testimony of his accomplices was not sufficiently corroborated. Based upon our review, we affirm the judgments of the trial court but remand for entry of a corrected judgment in Count 2.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Brian Antione Starks.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and James F. Todd and Gigi Braun, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On January 18, 1999, the defendant, armed with a pistol, and two codefendants attempted to rob Julius Talley. After discovering that the victim did not have any money, the defendant shot the victim four times, killing him, and then fled.

At trial, Xavier Gray, a codefendant, testified that on January 18, 1999, he spent the day with the defendant, Dewayne Hooten, and Andrew Jefferson, another codefendant. They drove to the

Rivergate Mall in a car the defendant had "pawned"[1] earlier that day. Before going inside the mall, Gray saw the defendant put a gun under the seat of the car. Subsequently, the four men returned to their neighborhood on Settle Court in the Sam Levy Housing Development where they began drinking gin and beer, smoking marijuana, and selling crack cocaine. The victim came to the neighborhood to buy drugs, first approaching Hooten and then the defendant. Travis Lawless, whom Gray identified as their "supplier," drove up, and the victim and the defendant went inside Lawless' residence with him, with Jefferson remaining outside.

Gray and Hooten then walked down the street to buy marijuana; when they returned, the defendant and the victim had come outside and Gray saw the defendant hand a gun to Jefferson. Holding the victim's shirt with his left hand and pointing a gun at the victim with his right hand, Jefferson told the victim, "I just want the money or the dope." The victim responded, "I ain't got no drugs. I don't have no money." Angered that the victim did not have any money or drugs, the defendant took the gun from Jefferson and told Jefferson and Gray to take the victim ten to twelve feet across the street to a dumpster. At the dumpster, the defendant repeatedly said, "I'm gonna kill him," as the victim begged for his life. The victim tried to run twice but was pushed back against the dumpster, first by Jefferson and then by Gray. As Gray and Jefferson turned to walk away, Gray heard a gunshot, turned back around, and saw the victim holding his hip and trying to run. The defendant then fired three or four more shots at the victim who ran to Lawless' yard where he collapsed.

Gray testified that he, the defendant, Hooten, and Jefferson then fled the scene, driving to the home of Patrice Woodland, the defendant's girlfriend. Jefferson asked the defendant why he had shot the victim, and the defendant replied, "I wish I wouldn't shot him." At Woodland's house, the defendant wrapped the gun in a pillowcase and took it to the back of the house. After taking Jefferson home, the defendant, Hooten, and Gray returned to Woodland's house where they spent the night.

Approximately two weeks later, the defendant "got caught on a violation of probation" and called Gray, instructing him, "Don't say nothing. You gonna beat this with . . . lack of evidence. So, if they come and ask for y'all, just be quiet. Don't say nothing about it." Gray admitted that he was untruthful at first when he was questioned by police but later told the truth and was then locked up at the Davidson County Juvenile Detention Facility. While confined there, he received a letter on his dinner tray from the defendant. Although the letter was not signed by the defendant, Gray knew it was from him because: it was addressed to "X-man," Gray's nickname; it mentioned "Drew" (Andrew Jefferson) and "Wayne-Wayne" (Dewayne Hooten); it discussed the shooting, referring to the victim as "Dude"; and it was signed "Your folks," which is the way Gangster Disciple members greeted each other. Gray said that both he and the defendant were members of the Gangster Disciples. The letter also mentioned the name of the defendant's attorney and told of "a deal" this attorney could get for Gray if he remained silent about the defendant's participation in

---

[1]Gray defined "pawned" as when a crack addict says, "You can keep my car for so many days for this amount of drugs."

the shooting. To explain why the defendant's fingerprints were found on the gun, the letter instructed Gray to say that the defendant bought the gun from Jefferson for $200 after the victim was killed with it. After the letter was entered as an exhibit, Gray was permitted to read it aloud to the jury.

Patrice Woodland testified that the defendant, Gray, Jefferson, and Hooten came to her house on January 18, 1999. The defendant gave her a gun and told her to "[h]old it till he came back." She said that she initially put the gun in a clothes hamper, but gave it to her mother the next day because she had small children at home. When questioned by the police a few days later, she told Detective Roy Dunaway that she had given the gun to her mother. Sara Woodland testified that her daughter, Patrice Woodland, had given her the gun, but she traded it for a gram of crack cocaine. She later was able to recover the gun from the person she traded with and turned it over to the police.

The State also called Dewayne Hooten to testify, but, while on the stand, he became uncooperative and was declared a hostile witness. During his testimony, his memory had to be refreshed several times with the prior statement he had given to the police. He testified that he was at the scene of the shooting but could not remember exactly what happened. He saw the defendant, Jefferson, Gray, and others walk around the corner and heard shouting and gunshots. He also testified that he drove them from the scene to the home of Patrice Woodland. When asked if he remembered telling the police in his statement that the defendant had said, "I wish I hadn't shot [the victim]," Hooten replied that he did not remember who said it.

Officer Johnny Ray Crumby, Jr., of the Nashville Metro Police Department testified that he and another officer were dispatched to the shooting at 325 Settle Court. When he arrived, emergency medical workers were already there, rendering medical assistance to the victim who was lying on the ground. Crumby secured the crime scene and looked for physical evidence but did not find any. He questioned people at the scene but "didn't locate anybody that knew anything."

Officer Jeffrey P. Odom, a crime scene technician with the Metro Police Department, testified that he was dispatched to the scene of the shooting at approximately 11:15 p.m. The only physical evidence found at the scene was the victim's clothing which had been cut off by emergency medical workers. After making photographs of the scene, Odom returned to the field office but was summoned by detectives at 3:30 a.m. to return to the scene. On his second visit to the crime scene, he collected a zipper clasp found on the ground near the 325 Settle Court building and photographed drug scales and a high-powered rifle found in one of the apartments. On cross-examination, Odom said he did not remember looking for fingerprints on the rifle or scales because they had already been handled by other persons. He testified that the surface area of the zipper clasp "was so small and so porous, that we wouldn't have had consistent ridge detail . . . to get a fingerprint that woulda [sic] been identifiable."

Detective Roy Dunaway of the Metro Police Department testified that he investigated the crime scene and found blood near the front porch of 325 Settle Court, a portion of a zipper, clothing removed from the victim, and a set of drug scales from the residence at 325 Settle Court. By the

following day, he had uncovered the nickname of "Little B" and the first name "Brian" from people in the area. After speaking with Travis Lawless and Kimberly Williams who lived at 325 Settle Court, Dunaway was given the defendant's name. He subsequently interviewed and was involved in the arrests of the defendant, Jefferson, and Gray. Dunaway also took statements from Dewayne Hooten, Patrice Woodland, and Sara Woodland, from whom he recovered the murder weapon. He was also present during the victim's autopsy and testified that three bullets were recovered from the victim's body, as well as a small plastic bag containing several rocks of crack cocaine from the victim's rectum. The bullets and the gun were sent to the Tennessee Bureau of Investigation ("TBI") Crime Lab for examination.

Dr. John E. Gerber, the medical examiner who performed the autopsy on the victim's body on January 19, 1999, testified that the victim sustained four gunshot wounds, one to the left lower back, one to the left flank, and two to the left thigh. Three bullets were recovered from the wounds, and blood tests revealed the presence of cocaine in the victim's body. Dr. Gerber also found a plastic bag containing a white substance in the victim's rectum.

TBI Special Agent Shelley Betts, a forensic scientist assigned to the firearms identification unit, testified that she examined the revolver[2] and the three bullets sent to her by the Metro Police Department and determined that the bullets recovered from the victim's body had been fired in the revolver.

Detective Dunaway further testified that he took Gray's statement a few days after the shooting and was present when Gray testified at the defendant's transfer hearing approximately five months later in June 1999. After being recalled to testify as a defense witness, Dunaway[3] related inconsistencies in Gray's statement and his testimony at the transfer hearing. In his statement, Gray had said he followed the defendant, Jefferson, and the victim across the street, but, at the transfer hearing, he admitted that he took the victim by his sleeves and pulled him across the street. Gray further admitted at the transfer hearing that he knew he was taking the victim across the street to be robbed. At one point in his testimony at the hearing, Gray said he had heard what the defendant said to Jefferson but later testified he had not heard their conversation. Despite these inconsistences, however, Dunaway said that Gray's testimony at the hearing about the defendant having the gun all day and shooting the victim was consistent with what Gray had said in his statement.

Following the testimony of Detective Dunaway, the defense rested its case in chief.

---

[2]Agent Betts's report identified the revolver as a Smith and Wesson .38 special.

[3]In the interim, Detective Dunaway had reviewed Gray's statement and apparently an audiotape of the defendant's transfer hearing.

## ANALYSIS

### Standard of Review

In Tennessee, the results reached by a jury in a criminal trial are afforded great weight. See State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995). On appeal from a guilty verdict, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from the evidence. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).

### I. Sufficiency of the Evidence

The defendant asserts that the evidence presented at trial was insufficient to support his convictions for first degree felony murder and attempted especially aggravated robbery.

To obtain a conviction for first degree murder, the State must prove:

> (1) A premeditated and intentional killing of another;
>
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or
>
> (3) A killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a) (1997). Proof at trial established that the victim, Julius Talley, was shot multiple times during the commission of a robbery. Therefore, the crime of first degree felony murder was established.

The testimony of Xavier Gray and Dewayne Hooten placed the defendant at the scene of the crime on January 18, 1999. Gray testified that the defendant was agitated after discovering that the victim did not have any money. The defendant then ordered Gray and Jefferson to take the victim across the street to a dumpster. The victim tried to run away twice but was unsuccessful. Hearing a gunshot, Gray turned around and saw the victim grab his hip and run around the side of the dumpster. The defendant ran to the other side of the dumpster, still firing his pistol. The victim ran to Travis Lawless' yard where he collapsed. Gray, Hooten, Jefferson, and the defendant got into a

car and drove away. In the car, Jefferson questioned the defendant about the shooting and he responded that he wished he had not shot the victim.

Patrice Woodland, the defendant's former girlfriend, testified that the defendant, Gray, Jefferson, and Hooten came to her residence on January 18, 1999, the night of the shooting, and the defendant gave her a pistol to "hold" for him. In turn, she gave this pistol to her mother, Sara Woodland, who recovered the weapon and gave it to police officers. TBI Special Agent Shelley Betts testified that the bullets recovered from the victim's body had been fired from the pistol.

Based on the evidence presented at trial, a rational jury could have concluded beyond a reasonable doubt that the defendant attempted to rob the victim with a pistol and, finding the victim with no money, shot and killed him. Accordingly, the evidence was sufficient to support the defendant's convictions for first degree felony murder and attempted especially aggravated robbery.

## II. Corroboration of Accomplice Testimony

The defendant argues on appeal that both Xavier Gray and Patrice Woodland were accomplices, and there was insufficient corroboration of their testimony inculpating the defendant. We will review this claim.

In Tennessee, it is well established that a defendant cannot be convicted of a felony on the uncorroborated testimony of an accomplice. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Sherrill v. State, 321 S.W.2d 811, 815 (Tenn. 1959); State v. Allen, 10 S.W.3d 286, 289 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1999); State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997). Whether an accomplice's testimony has been sufficiently corroborated to allow a guilty verdict is a question for the jury. Bigbee, 885 S.W.2d at 803. The court in Bigbee explained the nature of the evidence necessary to corroborate inculpatory testimony of a codefendant:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Id. (citations omitted).

We next will consider the definition of an accomplice, which is "an individual who knowingly, voluntarily and with common intent participates with the principal offender in the commission of an offense." State v. Lewis, 36 S.W.3d 88, 94 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2000). While the codefendant, Xavier Gray, fits within this definition, it is clear that Patrice Woodland does not. The evidence showed only that Woodland was asked by the defendant, her boyfriend, to "hold" a pistol. There is no proof she was told why he was giving her the weapon or what earlier use he had put it to.

As to Xavier Gray, there was evidence which the jury reasonably could have found corroborated his testimony, the evidence consisting of the letter, which the jury could have concluded the defendant sent to Gray, instructing Gray how to testify and exculpate the defendant, as well as Patrice Woodland's testimony that the defendant gave her the pistol identified as the murder weapon.

Accordingly, as to this issue, we conclude that the jury reasonably could have determined that Xavier Gray's testimony was corroborated by other evidence, and we conclude, as well, that Patrice Woodland was not an accomplice.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand for entry of a corrected judgment in Count 2 to reflect that the defendant was found guilty.

_____
ALAN E. GLENN, JUDGE